**The BOEING COMPANY, Appellant,**

v.

**Daniel C. SHIPMAN, Appellee.**

**No. 24588.**

United States Court of Appeals
Fifth Circuit.
April 7, 1969.

366

Harold F. Herring, Lanier, Shover &
Herring, Huntsville, Ala., for appellant.

Edgar E. Smith, Huntsville, Ala., for
appellee.

Fulbright, Crooker, Freeman, Bates &
Jaworski, Houston, Tex., Strasburger,

Price, Kelton, Martin & Unis, Dallas, Tex., amici curiae.

Samuel Langerman, Phoenix, Ariz., E. Wayne Thode, Salt Lake City, Utah, for American Trial Lawyers Assn.

William M. Howell, Jacksonville, Fla., Jones, Jones & Baldwin, Marshall, Tex., for Florida Defense Lawyers Assn.

James E. Clark, Birmingham, Ala., for Alabama Defense Lawyers Assn.

John Capers, Augusta, Ga., for Georgia Defense Lawyers Assn.

W. F. Goodman, Jr., Jackson, Miss., for Mississippi Defense Lawyers Assn.

Before JOHN R. BROWN, Chief Judge, and RIVES*, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GOD-BOLD, DYER, SIMPSON and MORGAN, Circuit Judges, En Banc.

AINSWORTH, Circuit Judge:

The importance of formulating a proper standard in federal court to test the sufficiency of the evidence for submission of a case to the jury, in connection with motions for a directed verdict and for judgment notwithstanding the verdict,[1] caused us to place this Alabama diversity personal injury suit en banc.

Shipman, an employee of Boeing, sued his employer for damages under the common law and the Alabama Employers' Liability Act (Tit. 26, § 326, Code of Ala., 1940), as a result of injuries he claims were received in the course of his work at Boeing's Huntsville, Alabama, plant. He was a spray painter and alleged that his employer was negligent in failing to furnish him with a reasonably safe place to work which was not properly ventilated to exhaust paint fumes; also, that he was not furnished with a mask to prevent inhalation of paint, nor with pro-

---

* Judge Rives was a member of the panel and author of the opinion in the initial decision, 5 Cir., 1968, 389 F.2d 507, and is therefore competent to sit in the rehearing en banc, Allen v. Johnson, 5 Cir., 1968, 391 F.2d 527, 528; 28 U.S. C.A. § 46(c); F.R.A.P. 35, Local Fifth Circuit Rule 12.

1. Rule 50 of the Federal Rules of Civil Procedure states in pertinent part:
   "(a) Motion for Directed Verdict: When Made; Effect. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
   "(b) Motion for Judgment Notwithstanding the Verdict. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later deter-

mination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial."
   "The propriety of granting or denying a motion for a directed verdict is tested both in the trial court and on appeal by the same rule. * * *" 2B Barron and Holtzoff, Federal Practice and Procedure § 1075, p. 378 (Wright ed. 1961), and cases cited therein. See also Bagalay, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Tex.L.Rev. 1053 (1964).

tective gloves for the handling of harmful chemicals, and that he was not warned of the dangers of his employment. He contended that he contracted lead poisoning, polyneuritis, dermatitis, and an aggravation of pre-existing bronchitis. Boeing denied any misconduct which might have caused Shipman's injuries and pled contributory negligence and assumption of risk and that the Alabama Workmen's Compensation Act barred an action for damages.

In the prior opinion in this case the Court said:

> "On the question of Boeing's alleged misconduct, the evidence is weak, especially in view of the short time that Shipman worked for Boeing. The evidence as to causal connection between the claimed unsafe conditions of Shipman's place of work and the ailments which he suffered can be held sufficient to sustain the jury's verdict only by the application of an extremely liberal standard." (389 F.2d at 511.)

Boeing's motions for a directed verdict during the trial and for judgment notwithstanding the verdict thereafter were denied by the District Judge, and the decision of a panel of this Court affirmed the lower Court. We hold that the opinion of a panel of this Court in the present case (389 F.2d 507) contained errors of law, which we overrule. Nevertheless, we affirm because the evidence was sufficient to create a question for the jury under the standard we have established, and the District Court, therefore, properly denied the motions for a directed verdict and for judgment notwithstanding the verdict.

We will not restate in detail the critical issues of fact on which Shipman based his case, since they are adequately treated in the original opinion herein, except to say that Shipman had been working for three months as a spray painter for Boeing and testified that the room in which he was working was not properly equipped with an exhaust system, that he was not provided with a respirator mask, that he inhaled paint particles as a result thereof, and that he also incurred injuries to his hands because of the failure to furnish him with gloves. The medical evidence was not conclusive, and the facts relating to the cause of Shipman's ailments were seriously disputed by Boeing. However, there was sufficient evidence of failure to provide a reasonably safe place to work and a face mask and gloves to require submission of the case to the jury under the standard we hereafter promulgate in this opinion.

## I.

## FEDERAL RATHER THAN STATE TEST IS APPLICABLE

■ It is well settled in this Circuit that in diversity cases federal courts apply a federal rather than a state test for the sufficiency of evidence to create a jury question.[2] Reuter v. Eastern Air

2. The Circuits are divided on the question of whether federal courts should apply a federal rather than a state test in determining the sufficiency of the evidence for submission to the jury, Dick v. New York Life Insurance Co., 359 U.S. 437, 444–445, 79 S.Ct. 921, 926, 3 L.Ed.2d 935 (1959), 5 Moore, Federal Practice ¶ 50.06, pp. 2348–2349 (2d ed. 1968); and, indeed, some Circuits have decisions on both sides of this question. 5 Moore, Federal Practice ¶ 50.06, p. 2349 (2d ed. 1968). Compare, e. g., Rumsey v. Great Atlantic & Pacific Tea Company, Inc., 3 Cir., 1968, 408 F.2d 89 (reheard en banc on November 25, 1968) and Rowe v. Pennsylvania Greyhound Lines, 2 Cir.,

1956, 231 F.2d 922, and Spruill v. Boyle-Midway, Incorporated, 4 Cir., 1962, 308 F.2d 79, with Woods v. National Life and Accident Insurance Company, 3 Cir., 1965, 347 F.2d 760, and Reynolds v. Pegler, 2 Cir., 1955, 223 F.2d 429, and Pinehurst, Inc. v. Schlamowitz, 4 Cir., 1965, 351 F.2d 509.

The following cases are representative of decisions adopting a state standard: Rowe v. Pennsylvania Greyhound Lines, 2 Cir., 1956, 231 F.2d 922; Gutierrez v. Public Service Interstate Transp. Co., 2 Cir., 1948, 168 F.2d 678; McDermott v. John Hancock Mutual Life Insurance Co., 3 Cir., 1958, 255 F.2d 562; Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 1948,

Lines, 5 Cir., 1955, 226 F.2d 443; Revlon, Inc. v. Buchanan, 5 Cir., 1959, 271 F.2d 795, 81 A.L.R.2d 222; Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir., 1967, 380 F.2d 869; Helene Curtis Industries, Inc. v. Pruitt, 5 Cir., 1967, 385 F.2d 841.[3]

In *Planters*, supra, Judge Tuttle exhaustively discussed this issue and pointed out (380 F.2d at 870–871) that although the Supreme Court had not yet resolved the question in favor of the federal test,[4] that Court had said in Byrd v. Blue Ridge Rural Electric Cooperative, 356 U.S. 525, 538, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958):

"It cannot be gainsaid that there is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts."

See also Herron v. Southern Pac. Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931); Simler v. Conner, 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963).

■ Federal courts must be able to control the fact-finding processes by

---

166 F.2d 908; Gilreath v. Southern Railway Company, 6 Cir., 1963, 323 F.2d 158; Trivette v. New York Life Insurance Company, 6 Cir., 1960, 283 F.2d 441; Wieloch v. Rogers Cartage Company, 7 Cir., 1961, 290 F.2d 235; Nattens v. Grolier Society, 7 Cir., 1952, 195 F.2d 449; Hanson v. Ford Motor Company, 8 Cir., 1960, 278 F.2d 586; Continental Can Company v. Horton, 8 Cir., 1957, 250 F.2d 637.

On the other hand, there are a large number of cases adopting a federal standard. See, e. g., Reynolds v. Pegler, 2 Cir., 1955, 223 F.2d 429; Woods v. National Life and Accident Insurance Company, 3 Cir., 1965, 347 F.2d 760; Lind v. Schenley Industries, Inc., 3 Cir., 1960, 278 F.2d 79; Pinehurst, Inc. v. Schlamowitz, 4 Cir., 1965, 351 F.2d 509; Burcham v. J. P. Stevens & Co., 4 Cir., 1954, 209 F.2d 35; Shirey v. Louisville & Nashville Railroad Company, 5 Cir., 1964, 327 F.2d 549; Kirby Lumber Corporation v. White, 5 Cir., 1961, 288 F.2d 566; ABC-Paramount Records, Inc. v. Topps Record Distributing Co., 5 Cir., 1967, 374 F.2d 455; Fruit Industries, Inc. v. Petty, 5 Cir., 1959, 268 F.2d 391; Gudgel v. Southern Shippers, Inc., 7 Cir., 1967, 387 F.2d 723; F. W. Woolworth Co. v. Carriker, 8 Cir., 1939, 107 F.2d 689; Safeway Stores v. Fannan, 9 Cir., 1962, 308 F.2d 94; Phipps v. N. V. Nederlandsche Amerikaansche S. M., 9 Cir., 1958, 259 F.2d 143; Christopherson v. Humphrey, 10 Cir., 1966, 366 F.2d 323; Basham v. City Bus Company, 10 Cir., 1955, 219 F.2d 547, 52 A.L.R.2d 582. In some instances, federal courts have found the federal and state standards to be nearly identical, or at least the same result to obtain under the particular facts of the case, and in this way the problem of choosing between state and federal tests was avoided. See, e. g., Metropolitan Coal Company v. Johnson, 1 Cir., 1959, 265 F.2d 173; Stephan v. Marlin Firearms Company, 2 Cir., 1965, 353 F.2d 819; Pritchard v. Liggett & Myers Tobacco Company, 3 Cir., 1961, 295 F.2d 292; Price v. Firestone Tire and Rubber Company, 6 Cir., 1963, 321 F.2d 725; Ozark Air Lines, Inc. v. Larimer, 8 Cir., 1965, 352 F.2d 9; Ahmann v. United Air Lines, Inc., 8 Cir., 1963, 313 F.2d 274 (Missouri, Arizona, and federal tests found to be substantially the same); Miller v. Brazel, 10 Cir., 1962, 300 F. 2d 283.

The commentators find the federal test controlling. 2B Barron and Holtzoff, Federal Practice and Procedure § 1072, p. 367 n. 5 (Wright ed. 1961). See 5 Moore, Federal Practice ¶ 50.06, p. 2350 (2d ed. 1968); Bagalay, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Tex.L.Rev. 1053, 1058 (1964); Note, State Trial Procedure and the Federal Courts: Evidence, Juries, and Directed Verdicts under the Erie Doctrine, 66 Harv.L.Rev. 1516, 1525 (1953).

3. See also Ricketson v. Seaboard Airline Railroad Company, 5 Cir., 1968, 403 F.2d 836; Brown v. Seaboard Coastline R. R., 5 Cir., 1968, 405 F.2d 601; Prassel Enterprises v. Allstate Ins. Co., 5 Cir., 1968, 405 F.2d 616; Cater v. Gordon Transport, Inc., 5 Cir., 1968, 390 F.2d 44; Keating v. Jones Development of Missouri, Inc., 5 Cir., 1968, 398 F.2d 1011; North River Insurance Company v. Hubbard, 5 Cir., 1968, 391 F.2d 863; Vandercook and Son, Inc. v. Thorpe, 5 Cir., 1968, 395 F.2d 104; Equitable Life Assurance Society of United States v. Fry, 5 Cir., 1967, 386 F.2d 239; Marshall v. Mintz, 5 Cir., 1967, 386 F.2d 415.

4. Dick v. New York Life Insurance Co., 359 U.S. 437, 444–445, 79 S.Ct. 921, 926, 3 L.Ed.2d 935 (1959); Mercer v. Theriot, 377 U.S. 152, 84 S.Ct. 1157, 12 L.Ed.2d 206 (1964).

which the rights of litigants are determined in order to preserve "the essential character" of the federal judicial system. Of course, we do not contend that this control will not affect state-created substantive rights in some cases. Ultimately, however, the integrity of our fact-finding processes must outweigh considerations of uniformity. Herron v. Southern Pac. Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931); Byrd v. Blue Ridge Rural Electric Cooperative, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); Note, State Trial Procedure and the Federal Courts: Evidence, Juries, and Directed Verdicts Under the Erie Doctrine, 66 Harv.L.Rev. 1516, 1525 (1953). Thus, we agree with the original opinion and reaffirm our holding, often repeated, that a federal rather than a state test is the proper one.

## II.

## FELA (FEDERAL EMPLOYERS' LIABILITY ACT) STANDARD FOR SUFFICIENCY OF EVIDENCE IS INAPPLICABLE

In the original opinion in this case the Court held that the standard to be applied by federal courts in diversity cases, to determine whether there is sufficient evidence to submit the case to the jury on motions for a directed verdict and for judgment notwithstanding the verdict, is the same as that in FELA (45 U.S.C. § 51 et seq.) and Jones Act (46 U.S.C. § 688) cases and that the "question has now been settled in this Circuit by the holding in Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir. 1967, 380 F.2d 869, * * * that federal courts must apply the same standards employed in FELA cases to diversity cases in determining sufficiency of evidence to raise a question of fact

for the jury. * * *" (389 F.2d at 513.) [5] Thus, in the present case the District Judge was obliged under the *Planters* principle to apply the same standard employed in FELA cases to the alleged negligent acts of Boeing and the extent and nature of Shipman's injuries in determining the sufficiency of evidence to create questions for the jury. The *Planters* principle, with which we disagree, is expressed as follows: "It is only when there is a *complete absence* of probative facts to support the conclusion reached that the jury's judgment may be ignored." (380 F.2d at 874.) The Court based this statement upon language in the Supreme Court's decision in Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 590 L.Ed. 916 (1946), *an FELA case,* in which that Court stated, "Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. * * *" (327 U.S. at 653, 66 S.Ct. at 744.)

■ FELA cases, however, are statutory negligence actions. The Act provides (45 U.S.C. § 51) that the employer shall be liable for damages "* * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees * * *." of the carrier. The Supreme Court held in Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 508, 77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957), that in FELA cases there is presented "* * * the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference." In *Rogers* the Supreme Court also said

5. The opinion further pointed out that Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir., 1967, 380 F.2d 869, had been followed by this Circuit in five recent cases, namely, Helene Curtis Industries Inc. v. Pruitt, 5 Cir., 1967, 385 F.2d 841; Liberty Mutual Insurance Company v. Falgoust, 5 Cir., 1967, 386 F.2d 248; Equitable Life Assurance Society of United States v. Fry, 5 Cir., 1967, 386 F.2d 239; Marshall v. Mintz, 5 Cir., 1967, 386 F.2d 415; and Remington Arms Company v. Wilkins, 5 Cir., 1967, 387 F.2d 48.

(352 U.S. at 506–507, 77 S.Ct. at 448–449):

"Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities."

See also Note, Rule 50(b): Judgment Notwithstanding the Verdict, 58 Colum. L.Rev. 517 (1958).

The Supreme Court further said in Rogers (352 U.S. at 506, 77 S.Ct. at 448):

"Under this statute [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the *slightest,* in producing the injury or death for which damages are sought." (Emphasis supplied.)

■ Slight negligence, necessary to support an FELA action, is defined as "a failure to exercise *great* care," and that burden of proof, obviously, is much less than the burden required to sustain recovery in ordinary negligence actions. Prosser, Law of Torts § 34, p. 186 (3d ed. 1964). (Emphasis supplied.) [6]

■■ Beyond the fact that a statutory action under the FELA significantly differs from a *common law negligence* action in terms of the standard of proof, it is clear that the congressional intent in enacting the FELA was to secure jury determinations in a larger proportion of cases than would be *true of ordinary* common law actions. In other words, "trial by jury is part of the remedy" in

FELA cases. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, 369 U.S. 355, 360, 82 S.Ct. 780, 784, 7 L.Ed.2d 798 (1962). As Mr. Justice Douglas stated in his concurring opinion in Wilkerson v. McCarthy, 336 U.S. 53, 68, 69 S.Ct. 413, 420, 93 L.Ed. 497 (1949),

"The Federal Employers' Liability Act was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations. * * *

"That purpose was not given a friendly reception in the courts. In the first place, a great maze of restrictive interpretations were engrafted on the Act * * *. In the second place, doubtful questions of fact were taken from the jury and resolved by the courts in favor of the employer. * * * And so it was that a goodly portion of the relief which Congress had provided employees was withheld from them.

"[Since 1943, however,] * * * The historic role of the jury in performing that function * * * [of passing on disputed questions of fact] is being restored in this important class of cases."

See also Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 508–509, 77 S.Ct. 443, 449–450, 1 L.Ed.2d 493 (1957). See generally Griffith, The Vindication of a National Public Policy Under the Employers' Liability Act, 18 Law & Contemp.Prob. 160 (1953). Thus, as the Eighth Circuit has stated,

"Under the [Federal Employers' Liability] Act, the right of the jury to pass upon the question of fault and causality must be most liberally viewed. * * * the jury's power to engage in inferences must be recognized as being significantly broader than in common law negligence actions."

6. For a general discussion of the legislative history of the FELA, which illuminates the congressional purpose to alter the common law rules on liability in this area, see Griffith, The Vindication of a National Public Policy Under the Federal Employers' Liability Act, 18 Law & Contemp. Prob. 160 (1953).

Chicago, Rock Island and Pacific Railroad Co. v. Melcher, 8 Cir., 1964, 333 F.2d 996, 999–1000.[7]

■ Though we have heretofore adopted in Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir., 1967, 380 F.2d 869, the FELA test of the sufficiency of evidence to create a jury question as a uniform federal standard fashioning a rule of general application, we now reject the *Planters* principle and hold that the FELA test is peculiar to that kind of case as a consequence of the statute itself and is accordingly not applicable in non-FELA jury trials.

■ As a corollary to the unique statutory context of FELA actions, it is apparent that in the general run of cases federal courts have rejected the legendary "scintilla" test. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720 (1930).[8] In 5 Moore, Federal Practice ¶ 50.02[1], p. 2324 (2d ed. 1968), we find the following pertinent commentary:

> "The federal courts are generally committed to a rejection of the so-called 'scintilla rule,' by which a court might not direct a verdict so long as there is any evidence in support of the proposition tendered by the party against whom the motion is directed. An argument might well be made that such a rule survives, in fact, if not in name, in FELA and Jones Act cases.[20] [20 See e. g., Harlan, J., dissenting in Ferguson v. Moore-McCormack Lines (1957) 352 U.S. 521, 563–564, 77 S.Ct. 457, 480, 1 L.Ed.2d 511, 519.] If so, its application is limited to those areas and cannot be extended beyond those special domains."

We agree with Professor Moore's analysis and conclusion that the FELA test should not be employed as a vehicle to re-establish the "scintilla" rule which has

---

7. See also Zegan v. Central Railroad Company of New Jersey, 3 Cir., 1959, 266 F.2d 101, 77 A.L.R.2d 768; Borgen v. Richfield Oil Corporation, 9 Cir., 1958, 257 F.2d 505; and Cahill v. New York, New Haven & Hartford R. R. Co., 2 Cir., 1955, 224 F.2d 637, 640, 641 (Frank, J., dissenting):
"I assume, arguendo, that the inference needed to support the verdict would not suffice in a suit not brought under the Federal Employees' Liability Act. But the more recent Supreme Court decisions make it clear that, under that Act, the jury's power to draw inferences is greater than in common-law actions." [Citing, inter alia, Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946); Jesionowski v. Boston & M. R. R., 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416 (1947); Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949); Smalls v. Atlantic Coast Line Railroad Company, 348 U.S. 946, 75 S.Ct. 439, 99 L.Ed. 740 (1955); Stone v. New York, C. & St. L. R. Co., 344 U.S. 407, 73 S.Ct. 358, 97 L.Ed. 441 (1953).]
" * * * And see Korte v. New York, N. H. & H. R. Co., 2 Cir., 191 F.2d 86, 88, and Ruddy v. New York Central R. Co., 2 Cir., 224 F.2d 96, where we recognized that the Supreme Court had widened the permissible scope of jury inferences in F.E.L.A. litigation. See also Louisville & N. R. Co. v. Botts, 8 Cir., 173 F.2d 164, 166."

8. See also, e. g., Brady v. Southern Ry. Co., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943); Baltimore & O. R. Co. v. Postom, 1949, 85 U.S.App.D.C. 207, 177 F.2d 53; M. C. Carlisle & Co. v. Cross, 1 Cir., 1967, 386 F.2d 672; Beaty Shopping Center, Inc. v. Monarch Ins. Co. of Ohio, 4 Cir., 1963, 315 F.2d 467; White v. New York Life Ins. Co., 5 Cir., 1944, 145 F.2d 504; Hogan v. United States, 5 Cir., 1963, 325 F.2d 276; Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443; Wells v. Warren Company, 5 Cir., 1964, 328 F.2d 666; Lovas v. General Motors Corp., 6 Cir., 1954, 212 F.2d 805; Hubert v. May, 7 Cir., 1961, 292 F.2d 239; Hawley v. Alaska Steamship Company, 9 Cir., 1956, 236 F.2d 307; Christopherson v. Humphrey, 10 Cir., 1966, 366 F.2d 323. See generally Blume, Origin and Development of the Directed Verdict, 48 Mich.L.Rev. 555 (1950); 5 Moore, Federal Practice ¶ 50.02 [1] (2d ed. 1968); Bagalay, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Tex.L.Rev. 1053 (1964); James, Sufficiency of the Evidence and Jury-Control Devices Available Before Verdict, 47 Va.L.Rev. 218 (1961).

been so firmly rejected by the federal judiciary.[9]

Although the Supreme Court has not answered the question of law,[10] no Circuit Court of the United States, other than the Fifth Circuit, has held that the FELA test of sufficiency of evidence is applicable in non-FELA cases.[11] The First Circuit expressly rejected the FELA standard in Dehydrating Process Co. v. A. O. Smith Corp., 1 Cir., 1961, 292 F.2d 653, 656 n. 6, stating that such cases had to be considered "on their own bottom," and the Court further said, "We do not appear to have considered this question ourselves, but a number of other circuits have reached this result without even discussion." [Citing, inter alia, Rhodes v. Metropolitan Life Insurance Co., 5 Cir. 1949, 172 F.2d 183, cert. denied, 337 U.S. 930, 69 S.Ct. 1495, 93 L.Ed. 1738.] See Gibson v. Elgin, Joliet & Eastern Railway Company, 7 Cir., 1957, 246 F.2d 834 (On Petition for Rehearing); Cahill v. New York, New Haven & Hartford R. R. Co., 2 Cir., 1955, 224 F.2d 637 (Frank J., dissenting).

Finally, the Seventh Amendment of the United States Constitution providing for trial by jury does not require, either expressly or impliedly, that the test of sufficiency of evidence to create a jury question in a non-FELA federal case be the same as in an FELA case. The tendency of some federal courts, at times, to use overly broad language or to cite indiscriminately FELA cases in non-FELA situations does not obviate this conclusion.[12] See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 700–701, 82 S.Ct. 1404, 1411, 8 L.Ed.2d 777 (1962); Harris v. Pennsylvania Railroad Co., 361 U.S. 15, 16, 80 S.Ct. 22, 23, 4 L.Ed.2d 1 (1959) (Mr. Justice Douglas, concurring); Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp., 3 Cir., 1963, 325 F.2d 2, 22.

The standard provided by the Supreme Court and Circuit Courts in FELA cases for sufficiency of evidence to create a jury question is proper under the Federal Employers' Liability Act, and with this we do not disagree. But in non-FELA federal cases which are not based on statute, the formulation of the test of sufficiency of evidence is substantially different.

## III.

## THE SUBSTANTIAL EVIDENCE OR REASONABLE MAN TEST

We now determine what the proper test should be in determining whether there is sufficient evidence to submit a

9. We note that the test of sufficiency of the evidence in FELA cases is very much like the Alabama rule which provides that if there is a scintilla of evidence a jury question is presented. See, e. g., Huff v. Vulcan Life & Accident Insurance Co., 281 Ala. 615, 206 So.2d 861 (1968); Scott v. Southern Coach & Body Co., 280 Ala. 670, 197 So.2d 775 (1967).

10. 2B Barron and Holtzoff, Federal Practice and Procedure § 1075, pp. 401, 404 (Wright ed. 1961).

"It is extremely important to know whether the decisions [in FELA and Jones Act cases] are confined to the particular statutory actions in which they have been handed down * * *.

* * * * *

"A decision by the Supreme Court, clearly stating which view it takes as to the scope of the FELA and Jones Act decisions, would be of helpful guidance to the lower federal courts."

11. See cases and authorities cited in Part III of this opinion, infra. But see DeParcq, The Supreme Court and the Federal Employers' Liability Act, 1958–1959 Term, 44 Minn.L.Rev. 707 (1960); Bagalay, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Tex.L.Rev. 1053 (1964); Green, Protection of Jury Trial in Diversity Cases Against State Invasions, 35 Tex.L.Rev. 768 (1957). For a summary of the arguments in favor of applying the FELA rule to non-FELA cases, see 2B Barron and Holtzoff, Federal Practice and Procedure § 1075 (Wright ed. 1961).

12. But see Bagalay, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Tex.L.Rev. 1053 (1964).

case to the jury in connection with motions for directed verdict in a federal court trial.[13] The standard we announce is the result of a thorough study of the numerous prior decisions of this Court which have dealt with the subject.[14] Our task is compounded by the fact that many legal writers and commentators have used different formulations in propounding these standards and the language utilized by them remains diverse and occasionally troublesome. See 5 Moore, Federal Practice ¶ 50.02 [1], p. 2330 (2d ed. 1968); Note, Rule 50(b): Judgment Nowithstanding the Verdict, 58 Colum.L.Rev. 517, 522 n. 45; Blume, Origin and Development of the Directed Verdict, 48 Mich.L.Rev. 555 (1950).[15]

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and

13. The directed verdict practice does not offend the Seventh Amendment. Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); Blume, Origin and Development of the Directed Verdict, 48 Mich.L.Rev. 555 (1950). But see Galloway v. United States, 319 U.S. 372, 396, 63 S.Ct. 1077, 1090, 87 L.Ed. 1458 (Mr. Justice Black, dissenting); Statement of Mr. Justice Black and Mr. Justice Douglas on the Rules of Civil Procedure and the Proposed Amendments, 374 U.S. 865, 83 S.Ct. 43 (1963). See generally 5 Moore, Federal Practice ¶ 50.02[2] (2d ed. 1968) and cases cited therein.

14. See, e. g., Ricketson v. Seaboard Airline Railroad Co., 5 Cir., 1968, 403 F.2d 836; Keating v. Jones Development of Missouri, Inc., 5 Cir., 1968, 398 F.2d 1011; Helene Curtis Industries, Inc. v. Pruitt, 5 Cir., 1967, 385 F.2d 841; Liberty Mutual Insurance Company v. Falgoust, 5 Cir., 1967, 386 F.2d 248; Equitable Life Assurance Society of United States v. Fry, 5 Cir., 1967, 386 F.2d 239; Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443; Wells v. Warren Company, 5 Cir., 1964, 328 F.2d 666; White v. New York Life Ins. Co., 5 Cir., 1944, 145 F.2d 504.

15. See, e. g., Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720 (1930) (evidence must be "overwhelmingly on one side"); Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943) ("mere speculation" not allowable); Brady v. Southern Ry. Co., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943) (directed verdict proper only where "there can be but one reasonable conclusion"); Muldrow v. Daly, 1964, 117 U.S.App.D.C. 318, 329 F.2d 886 ("no reasonable man could reach" a contrary verdict); Magnat Corporation v. B&B Electroplating Co., 1 Cir., 1966, 358 F.2d 794 ("lack of substantial evidence" necessary to direct a verdict); Woods v. National Life and Accident Insurance Company, 3 Cir., 1965, 347 F.2d 760 (evidence must permit only "one reasonable conclusion"); Crosby v. Meredith, 4 Cir., 1962, 300 F.2d 323 ("substantial evidence" required); Wells v. Warren Company, 5 Cir., 1964, 328 F.2d 666 ("conflict in substantial evidence" necessary); Remington Arms Company, Inc. v. Wilkins, 5 Cir., 1967, 387 F.2d 48 (there must be "a rational basis in the record"); Ford Motor Company v. Zahn, 8 Cir., 1959, 265 F.2d 729 ("all or substantially all of the evidence" must be on one side); McCollum v. Smith, 9 Cir., 1964, 339 F.2d 348 (question is whether evidence "would rationally support a verdict" for the non-moving party); Champion Home Builders v. Shumate, 10 Cir., 1967, 388 F.2d 806 ("evidence must all be one way"); Hyman and Newhouse, Standards for Preferred Freedoms: Beyond the First, 60 Nw.L.Rev. 1, 15 (1965) (no submission to jury unless "*substantial*, or *high* probability of the plaintiff's proposition, or that there be a *substantially even* chance of its truth").

judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.[16]

16. The Court should consider *all* of the evidence and not just that evidence which supports the non-mover's case.

The Supreme Court in Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L. Ed. 497 (1949), an FELA case, held that all the evidence should not be considered in a motion for a directed verdict. However, the Courts of Appeals have tended to reach the conclusion that all the evidence should be considered, "distinguishing *Wilkerson* on the ground that FELA cases are sui generis." 5 Moore, Federal Practice ¶ 50.02[1], p. 2329 (2d ed 1968). See Dehydrating Process Co. v. A. O. Smith Corp., 1 Cir., 1961, 292 F.2d 653, 656 n. 6; Magnat Corporation v. B&B Electroplating Co., 1 Cir., 1966, 358 F.2d 794, 797 n.; Muldrow v. Daly, 1964, 117 U.S.App.D.C. 318, 329 F.2d 886, 888; Stief v. J. A. Sexauer Manufacturing Co., 2 Cir., 1967, 380 F.2d 453, 455 (" * * * the function of this court on appellate review is to examine the entire record to determine whether there were any jury questions."); Carroll v. Seaboard Air Line Railroad Company, 4 Cir., 1967, 371 F.2d 903, 904 (by inference); Rhodes v. Metropolitan Life Ins. Co., 5 Cir., 1949, 172 F.2d 183, 185; Pinkowski v. Sherman Hotel, 7 Cir., 1963, 313 F.2d 190, 192; Christopherson v. Humphrey, 10 Cir., 1966, 366 F.2d 323, 325 (by inference). See generally Blume, Origin and Development of the Directed Verdict, 48 Mich.L.Rev. 555 (1950). But see Bagalay, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Tex.L.Rev. 1053, 1060–1061 (1964).

The evidence must be considered in the light and with all reasonable inferences most favorable to the party opposed to the motion.

See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 (1930); Alden v. Providence Hospital, 1967, 127 U.S.App.D.C. 214, 382 F.2d 163, 165; Muldrow v. Daly, 1964, 117 U.S.App.D.C. 318, 329 F.2d 886, 888; Dehydrating Process Co. v. A. O. Smith Corp., 1 Cir., 1961, 292 F.2d 653, 656 n. 6; O'Connor v. Pennsylvania Railroad Company, 2 Cir., 1962, 308 F.2d 911, 914; Pritchard v. Liggett & Myers Tobacco Company, 3 Cir., 1961, 295 F. 2d 292, 295; Beaty Shopping Center, Inc. v. Monarch Ins. Co. of Ohio, 4 Cir., 1963, 315 F.2d 467, 469; Richmond Television Corporation v. United States, 4 Cir., 1965, 354 F.2d 410, 414; Round Rock Independent Sch. Dist. v. First National Ins. Co., 5 Cir., 1963, 324 F.2d 280, 281; Herron v. Maryland Casualty Company, 5 Cir., 1965, 347 F.2d 357, 358; Minton v. Southern Railway Company, 6 Cir., 1966, 368 F.2d 719, 720; Dorin v. Equitable Life Assurance Society of United States, 7 Cir., 1967, 382 F.2d 73, 77; Czap v. Marshall, 7 Cir., 1963, 315 F.2d 766, 768; Breeding v. Massey, 8 Cir., 1967, 378 F.2d 171, 176; Ozark Air Lines, Inc. v. Larimer, 8 Cir., 1965, 352 F.2d 9, 11; McCollum v. Smith, 9 Cir., 1964, 339 F.2d 348, 349; United States v. Holland, 9 Cir., 1940, 111 F.2d 949, 953; United States v. Fenix and Scisson, Inc., 10 Cir., 1966, 360 F.2d 260, 262; Christopherson v. Humphrey, 10 Cir., 1966, 366 F.2d 323, 325–326.

See generally 2B Barron and Holtzoff, Federal Practice and Procedure § 1075 (Wright ed. 1961); 5 Moore, Federal Practice ¶ 50.02[1] (2d ed. 1968); Bagalay, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Tex. L.Rev. 1053, 1066 (1964).

If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. 5 Moore, Federal Practice ¶ 50.02[1] (2 ed. 1968) and cases cited therein.

See, e. g., McWilliams v. Shepard, 1942, 75 U.S.App.D.C. 334, 127 F.2d 18, 19; O'Connor v. Pennsylvania Railroad Company, 2 Cir., 1962, 308 F.2d 911, 915; McCracken v. Richmond, Fredericksburg & Potomac R. Co., 4 Cir., 1957, 240 F. 2d 484, 488; Ricketson v. Seaboard Airline Railroad Co., 5 Cir., 1968, 403 F.2d 836, 839; Minton v. Southern Railway Company, 6 Cir., 1966, 368 F.2d 719, 720; Ahmann v. United Air Lines, Inc., 8 Cir., 1963, 313 F.2d 274, 282; Champion Home Builders v. Shumate, 10 Cir., 1967, 388 F.2d 806, 808.

See generally 2B Barron and Holtzoff, Federal Practice and Procedure, § 1075 (Wright ed. 1961) ; Hyman and Newhouse, Standards for Preferred Freedoms: Beyond the First, 60 Nw.L.Rev. 1, 15 (1965).

If there is substantial evidence opposed to the motions, of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

See, e. g., Alden v. Providence Hospital, 1967, 127 U.S.App.D.C. 214, 382 F.2d 163, 165; Muldrow v. Daly, 1964, 117 U.S.App.D.C. 318, 329 F.2d 886, 888; M. C. Carlisle & Co. v. Cross, 1 Cir., 1967, 386 F.2d 672, 674–675; Magnat Corporation v. B&B Electroplating Co., 1 Cir., 1966, 358 F.2d 794, 797 n.; Julien J. Studley, Inc. v. Gulf Oil Corporation, 2 Cir., 1967, 386 F.2d 161, 162–163; Diapulse Corporation of America v. Birtcher Corporation, 2 Cir., 1966, 362 F.2d 736; Pritchard v. Liggett & Myers Tobacco Company, 3 Cir., 1961, 295 F. 2d 292, 295; Nuckoles v. F. W. Woolworth Company, 4 Cir., 1967, 372 F.2d 286, 288; American Casualty Company of Reading, Pa. v. Gerald, 4 Cir., 1966, 369 F.2d 829, 833; Lyle v. R. N. Adams Construction Co., 5 Cir., 1968, 402 F.2d 323; Ricketson v. Seaboard Airline Railroad Co., 5 Cir., 1968, 403 F.2d 836; 839; Wells v. Warren Company, 5 Cir., 1964, 328 F.2d 666, 668–669; Hogan v. United States, 5 Cir., 1963, 325 F.2d 276, 277; Minton v. Southern Railway Company, 6 Cir., 1966, 368 F.2d 719, 720; Taylor v. Cirino, 6 Cir., 1963, 321 F.2d 279, 281; Berry Refining Company v. Salemi, 7 Cir., 1965, 353 F.2d 721, 722; Pinkowski v. Sherman Hotel, 7 Cir., 1963, 313 F.2d 190, 192; Compton v. United States, 8 Cir., 1967, 377 F. 2d 408, 411–412; Schultz & Lindsay Construction Company v. Erickson, 8 Cir., 1965, 352 F.2d 425; Wong v. Swier, 9 Cir., 1959, 267 F.2d 749, 752; Peter Kiewit Sons Company v. Clayton, 10 Cir., 1966, 366 F.2d 551, 554; Adams v. Powell, 10 Cir., 1965, 351 F.2d 273, 274.

See generally Note, Rule 50(b): Judgment Notwithstanding the Verdict, 58 Colum.L.Rev. 517 (1958) ; 5 Moore, Federal Practice ¶ 50.02 (2d ed. 1968) ; 2B Barron and Holtzoff, Federal Practice and Procedure § 1075 (Wright ed. 1961) ; Wright, Federal Courts § 94; Hyman and Newhouse, Standards for Preferred Freedoms: Beyond the First, 60 Nw.L.

Rev. 1 (1965) ; Bagalay, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Tex.L.Rev. 1053, 1060 (1964).

A mere scintilla of evidence is insufficient to present a question for the jury. See cases and authorities cited in note 8, supra.

The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case.

See, e. g., Simmonds v. Capital Transit Co., 1945, 79 U.S.App.D.C. 371, 147 F. 2d 570, 571; Crosby v. Meredith, 4 Cir., 1962, 300 F.2d 323, 325; McCracken v. Richmond, Fredericksburg & Potomac R. Co., 4 Cir., 1957, 240 F.2d 484, 488; Employers Mutual Casualty Co. of Des Moines v. Mosqueda, 5 Cir., 1963, 317 F.2d 609, 613; Hogan v. United States, 5 Cir., 1963, 325 F.2d 276, 277; Compton v. United States, 8 Cir., 1967, 377 F. 2d 408, 411–412; Ahmann v. United Air Lines, Inc., 8 Cir., 1963, 313 F.2d 274, 281; United States v. Holland, 9 Cir., 1940, 111 F.2d 949, 953; United States v. Hess, 10 Cir., 1965, 341 F.2d 444, 447 n.; Continental Baking Company v. Utah Pie Company, 10 Cir., 1965, 349 F.2d 122, 147.

Motions for directed verdict and judgment n.o.v. should not be granted only when there is a complete absence of probative facts to support a jury verdict. See Part II of this opinion, supra, and cases cited therein.

It is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

Rainey v. Gay's Express, Inc., 1 Cir., 1960, 275 F.2d 450, 451; O'Connor v. Pennsylvania Railroad Company, 2 Cir., 1962, 308 F.2d 911, 915; Woods v. National Life and Accident Insurance Company, 3 Cir., 1965, 347 F.2d 760, 768; Boleski v. American Export Lines, Inc., 4 Cir., 1967, 385 F.2d 69, 74; Wells v. Warren Company, 5 Cir., 1964, 328 F.2d 666, 668–669; Necaise v. Chrysler Corporation, 5 Cir., 1964, 335 F.2d 562, 567; Isaacs v. American Petrofina, 5 Cir., 1966, 368 F.2d 193, 196; Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co., 6 Cir., 1964, 332 F.2d 406, 412; Dorin v. Equitable Life Assurance Society of United States, 7 Cir., 1967, 382 F.2d 73, 77; Ahmann v. United Air Lines, Inc., 8 Cir., 1963, 313 F.2d 274, 281; Shafer v. Mountain States Tel. & Teleg. Co., 9 Cir., 1964, 335 F.2d 932, 934; Continental Baking Company v. Utah Pie Company, 10 Cir., 1965, 349 F. 2d 122, 147.

Since the Court is sitting en banc in this matter, we overrule all prior decisions of this Court insofar as they conflict with this opinion, special reference being made to those portions of the original opinion of the Court in the present case and in Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir., 1967, 380 F.2d 869, which do not conform.

## IV.

## CONSIDERATION OF THE MERITS

■ Despite our holding that the original opinion of the panel in this case is based on erroneous principles of law, we have concluded that the facts of record sufficently meet the test we have now formulated to require affirmance of the District Court's ruling which denied the motions for directed verdict and judgment notwithstanding the verdict and submitted the case to the jury for its verdict. The jury could fairly conclude from all of the evidence, though disputed, that Boeing was negligent in failing to provide Shipman with a reasonably safe place to work and with a serviceable face mask and adequate gloves. Also, that Shipman was obliged to work in an area where the booth exhaust fan was either off or inadequate to siphon off paint fumes in the area in which he was working. Though the expert medical proof is not entirely reliable in determining the causal connection between Shipman's working conditions and his ailments, uncontroverted lay testimony showed that Shipman was not suffering from polyneuritis or dermatitis prior to working for Boeing. Although he had suffered from bronchitis previously, the jury could conclude from the evidence that the condition was aggravated by Boeing's failure to provide a face mask and adequate ventilation.

Applying the standards we have set forth in this opinion and considering all the evidence in the record, we hold that the District Judge properly denied the motions for directed verdict and judgment notwithstanding the verdict and committed no error in sending the case to the jury.

Affirmed.

RIVES, Circuit Judge (concurring in part and dissenting in part):

## PREFACE

Decision of this appeal should turn on the Seventh Amendment: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." The question of sufficiency of the evidence to require submission of a case to the jury presents a constitutional problem. Galloway v. United States, 1943, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458.

Ordinarily a court seeks ways to avoid deciding a constitutional question. When the en banc majority by application of the standard which it promulgates reaches the same result as the original panel reached by application of the FELA standard, it may not seem necessary to decide whether the FELA standard differs from the Seventh Amendment standard and, hence, is inapplicable to diversity cases. However, that question was necessary for the panel on original hearing of this case to decide (see 389 F.2d at 511) and was material to the decision in Planters (see 380 F.2d at 870 n. 1 and 873 n. 4), and consequently is proper to be ruled on upon this en banc rehearing. Moreover, because of the frequency with which that question arises, it is both proper and advisable for the majority to decide it in the exercise of this Court's supervisory control over the district courts.[1]

With deference, I submit that when the majority repudiates for diversity cases

1. See La Buy v. Howes Leather Co., 1957, 352 U.S. 249, 259, 260, 77 S.Ct. 309, 1 L.Ed.2d 290; Thomas v. United States, 5 Cir., 1966, 368 F.2d 941, 946, 947.

the FELA standard and particularly the formula adopted in Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, it commits an error of constitutional proportions which will continue to plague this Court and the district courts of this Circuit until the Supreme Court grants certiorari in this or some future [2] case, and corrects the error.

The majority does not " * * * restate in detail the critical issues of fact on which Shipman based his case, since they are adequately treated in the original opinion herein * * *." While the original opinion is accurate in its statement of the facts, it is not complete because it refers to the briefs of the parties as follows:

"There was a mass of additional evidence as to the safety of the place to work, which we find to be accurately summarized on pages 4 to 16 of the appellant's brief. The appellee does not dispute appellant's statement, but files a statement (appellee's brief, pp. 2–4) 'supplemental in nature since appellant has set forth a rather lengthy statement in its brief.'"

389 F.2d 507, 510. Moreover, the appellant is not satisfied with the statement of the facts in our original opinion, but spends six pages of its brief on rehearing criticizing that statement and charging that, "There is no placing of the evidence in context with the overwhelming opposition evidence entered by appellant, evidence which would rob appellee's evidence of any persuasiveness." In any

event, the importance of this en banc consideration suggests a detailed statement of all of the facts. I therefore attach as an appendix to this opinion a full statement of the facts.

This is no occasion for an old common-law lawyer to indulge in a panegyric on the virtues of jury trial; how in our fallible system of human justice it is the best instrument yet devised for the determination of facts, how even its imperfections operate to rub the rough edges off of technical principles of law when they would result in unjust verdicts, how it is constantly improving with the progress of our jurisprudence and with the advance of education and enlightenment, how it gives the citizen a proud and rightful place in the administration of justice, and tends to make real our utopian dream of a "government of the people, by the people, and for the people." There are many who do not agree with my almost reverential attitude toward jury trial, but this is no occasion for a debate on that subject, because our forefathers wrote into our Constitution the right of trial by jury in both criminal and civil cases.[3] Moreover, as to civil cases with which we are here concerned, the Supreme Court has written at length in the leading case of Galloway v. United States, *supra*.

With deference, I submit that the polished and scholarly majority opinion has one fundamental weakness. It downgrades the Seventh Amendment. Toward the end of the part of the opinion cap-

---

2. Of course the appellee will not seek certiorari in this case, for the *judgment* in his favor is affirmed. It may or may not be to the financial interest of the appellant to seek certiorari. While it loses the small judgment, it wins the important opinion; on the other hand, if upon certiorari it can secure approval of that opinion by the Supreme Court, its position will be strengthened in other circuits. Hopefully, less selfish motives looking toward settling the jurisprudence may actuate the appellant's counsel and the appellant itself. In any event, the question is one so frequently presented that a petition for certiorari in some case can hardly be far distant.

3. Art. III, § 2 of the Constitution and the Sixth and Seventh Amendments. In a suit under the Jones Act for personal injuries, the Supreme Court said: "The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts." Jacob v. New York, 1942, 315 U.S. 752, 753, 62 S.Ct. 854, 86 L.Ed. 1166.

tioned "II. FELA (FEDERAL EMPLOYERS' LIABILITY ACT) STANDARD FOR SUFFICIENCY OF EVIDENCE IS INAPPLICABLE," it mentions: "Finally, the Seventh Amendment of the United States Constitution providing for trial by jury does not require, either expressly or impliedly, that the test of sufficiency of evidence to create a jury question in a non-FELA federal case be the same as in an FELA case." I do not agree. My text is that the FELA standard is based upon the Constitution. That proposition is virtually ignored by the majority. It is my hope that a single judge armed with the Constitution can persuade a majority. Certainly his oath compels him to try.

With those prefatory remarks, I proceed to a discussion of the issues in the same order as the majority en banc opinion.

## I.

### "FEDERAL RATHER THAN STATE TEST IS APPLICABLE"

The majority concludes Part I of its opinion with the statement: "Thus, we agree with the original opinion and reaffirm our holding, often repeated, that a federal rather than a state test is the proper one." As said in Wright v. Paramount-Richards Theatres, 5 Cir. 1952, 198 F.2d 303, 305:

"* * * in federal courts the principle just adverted to [the *Erie* doctrine] must give way to the overriding consideration that the federal court is bound by the Seventh Amendment to the Constitution of the United States."

The dichotomy is the same as that expressed by the Supreme Court in Simler v. Conner, 1963, 372 U.S. 221, 222, 83 S.Ct. 609, 610, 9 L.Ed.2d 691:

"In diversity cases, of course, the substantive dimension of the claim asserted finds its source in state law * *, but the characterization of that state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law." [4]

I concur in Part I of the majority opinion.[5]

## II.

### FELA (FEDERAL EMPLOYERS' LIABILITY ACT) STANDARD FOR SUFFICIENCY OF EVIDENCE IS APPLICABLE

Perhaps in no field of the law is the cleavage between substance and procedure more sharply drawn than in the difference between the *substantive elements* of a claim or cause of action and the *remedy* by jury trial. That is necessarily true because the substantive rights and duties are prescribed by contract, by the common law, or by statute, while the right of jury trial is preserved by the Seventh Amendment. The Amendment

---

4. The same dichotomy was recognized in Wright v. Paramount-Richards Theatres, *supra*, 198 F.2d at 306:
   "In Louisiana state courts, the right to trial by jury guaranteed by the Seventh Amendment of the United States Constitution does not exist. The Louisiana Code of Practice of 1870 provides for jury trials in certain civil cases; but appellate courts have the right and duty to review both the law and the facts in all civil cases. La. Constitution of 1921, Art. 7, Sec. 10.
   "Federal courts are forbidden by the Seventh Amendment to re-examine any fact tried by a jury otherwise than according to the rules of the common law, while Louisiana state courts can review the facts in all civil cases. As a consequence of that situation, in civil jury cases federal courts evaluating decisions of Louisiana state courts as precedents have the difficult task of separating the decisions of the Louisiana courts on the law from their review of the facts.
   "The substantive law governing this case has been clearly enunciated by the Supreme Court of Louisiana in two recent decisions; Cassanova v. Paramount-Richards Theaters, Inc., 204 La. 813, 16 So.2d 444, and Allen v. Shreveport Theatre Corp., 218 La. 1008, 51 So.2d 607 [24 A.L.R.2d 637]."

5. The latest opinion on this subject which has come to my attention is Denneny v. Siegel, 3 Cir., Feb. 20, 1969, 407 F.2d 433.

accomplishes that separation simply by addressing itself to each separate fact— " * * * no fact tried by a jury * * * "—and that applies irrespective of the substantive nature of the claim. The claim may arise out of either contract or tort. The variety of tort duties is almost without limit. For example, the railroad owes to a trespasser only the duty not to willfully or wantonly inflict injury or not to negligently injure him after discovering his peril; in its role as a common carrier, the railroad owes to its passenger the highest degree of care; as an employer under the FELA, the railroad is liable to its employee for any negligence, however slight, which contributes to cause the injury. Rogers v. Missouri Pacific Railroad Co., 1957, 352 U.S. 500, 508, 77 S.Ct. 443, 1 L.Ed. 2d 493. Under bills of lading and under various other contracts, the extent of variation in the railroad's duties is infinite for the railroad's duty is measured by the terms of the particular contract and the applicable public policy. Breach of duty in any one of the capacities just mentioned may result in a "suit at common law" against the railroad. In every one of these varied cases where the value in controversy exceeds twenty dollars, the right of either the plaintiff or the defendant to a jury trial is preserved by the Seventh Amendment and no fact of whatever description can be re-examined in any federal court except according to the rules of the common law. In each and all of these varied cases, when the substantive claim and the remedy are considered separately the same standard is applicable to test the sufficiency of the evidence for submission of the case to a jury.

It goes without saying that the *result* of the application of that standard varies according to the substantive elements of the claim. For example, it is rare that a trespasser can produce evidence warranting submission of his case to a jury, and, at the other extreme, it is rare that an employee in an FELA action fails to produce such evidence. The reason lies not in any difference in the standard of sufficiency of the evidence to preserve the right of trial by jury but in the vast differences between the substantive elements of the torts.

That is strikingly illustrated by a very recent Ohio State case (decided December 24, 1968), Mills v. Pennsylvania N.Y. C. Transp. Co., 16 Ohio St.2d 97, 243 N.E.2d 99. Syllabus No. 1 prepared by the court reads: "State procedural law and federal substantive law govern the disposition of actions brought in state courts pursuant to the provisions of the Federal Employers' Liability Act (Section 51 et seq., Title 45, U.S. Code)."

The Ohio Court summarized the facts and holdings of several of the United States Supreme Court cases [6] interpreting the Federal Employers' Liability Act, and then said:

"These cases demonstrate how strictly the rule of the *Rogers* case (that any employer negligence, however slight, which contributes to cause the injury is actionable) is to be applied in all F.E.L.A. cases.[1]

"1. We have held that the use of the words, 'in the slightest degree,' or the phrase, 'in any degree,' in connection with contributory negligence in a charge to the jury in an action under state substantive law constitutes reversible error. See Bahm v. Pittsburgh & Lake Erie Rd. Co., 6 Ohio St.2d 192, [217 N.E.2d 217].

"In the instant case, the plaintiff alleges (and there is evidence in the rec-

6. Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Gallick v. Baltimore & Ohio R. Co., 1963, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed. 2d 618; Webb v. Illinois Central R. Co., 1957, 352 U.S. 512, 77 S.Ct. 451, 1 L.Ed. 2d 503; Brown v. Western Ry. of Ala., 1949, 338 U.S. 294, 70 S.Ct. 105, 94 L. Ed. 100; McBride v. Toledo Terminal R. Co., 1957, 354 U.S. 517, 77 S.Ct. 1398, 1 L.Ed.2d 1534; Harris v. Pennsylvania R. Co., 1959, 361 U.S. 15, 80 S.Ct. 22, 4 L.Ed.2d 1.

ord to support) two bases for railroad negligence:

"(1) There was inadequate lighting at the place of the injury, creating a hazardous situation.

"(2) There was coal and other debris lying around the immediate vicinity where plaintiff was working.

"This case, in light of the United States Supreme Court cases interpreting the Federal Employers' Liability Act, should have been allowed to go to the jury, and accordingly we reverse the judgment of the Court of Appeals.

"We do this reluctantly, and invite the United States Supreme Court to consider how closely the strict application of the rule of the *Rogers* case approaches a scheme of workman's compensation, substituting the jury in place of a board of experts and allowing an open-end award in lieu of a fixed statutory amount. The amount of damages awarded by juries in F.E.L.A. actions often appears exorbitant when compared to the slight degree of employer negligence which contributed to cause the employee's injury.[2] We believe that it would be

"2. The jury awards in the cases discussed were as follows: *Rogers*, $40,000; *Gallick*, $625,000; *Webb*, $15,000; *McBride*, $51,000 and *Harris*, $25.000.

appropriate for the United States Supreme Court to carefully review its former decisions, in light of the fact that the rule of the *Rogers* case, as it has been applied, imposes legal responsibilities on railroad employers that the Congress of the United States never intended."

16 Ohio St.2d at 104, 105, 243 N.E.2d at 103, 104.

It is like gilding the lily for me to add anything to Chief Judge Tuttle's masterful analysis and decision in Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir. 1967, 380 F.2d 869, 871–

7. *See* Blume, Origin and Development of the Directed Verdict, 48 Mich.L.Rev. 555, 579–581 (1950); 5 Moore, Federal Practice ¶ 50.02[1], pp. 2329–2330 (2d ed. 1968); 2B Barron & Holtzoff § 1075, pp. 399–404.

875. The en banc majority opinion, however, leaves me no alternative.

In his opinion for the Court in *Planters*, Judge Tuttle did not so much as mention Wilkerson v. McCarthy, 1949, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497. Only by remote implication can it be asserted that Judge Tuttle adopted an *apparent* holding of *Wilkerson* that on motions for directed verdict and judgment notwithstanding the verdict, the court should consider only the evidence and inferences which support the non-mover's case. *Wilkerson* was first cited along that line by this Court in Helene Curtis Industries, Inc. v. Pruitt, 1967, 385 F.2d 841, 850, a case in which I participated. I am not convinced that the *Helene Curtis'* reference to *Wilkerson* was erroneous. That case simply employs the same language as *Wilkerson*, and when properly understood, as will be presently developed, that language is not erroneous. But I must frankly confess that in my opinion for the Court on the original hearing of the instant case, I made what I now acknowledge to be an erroneous contrast between the Alabama State rule and the federal rule by considering in isolation the following sentence in Wilkerson v. McCarthy, 336 U.S. at p. 57, 69 S.Ct. at p. 415: "It is the established rule that in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of a litigant against whom a peremptory instruction has been given." Boeing Company v. Shipman, 5 Cir. 1968, 389 F.2d 507, 511. The criticism which that sentence has provoked[7] arises, I submit, from a misunderstanding which becomes apparent when the sentence is read in the totality of the factual context out of which it arose.

The *Wilkerson* facts were simple. The railroad had constructed a wheel-pit in which mechanics who changed wheels

could get under train cars. Over this pit was extended a 20″ wide plank which was not firmly set or attached and which had been permitted to become oily and slippery. At one time the plank was used by *all* employees working in the yard. Subsequently, the railroad erected posts and chains ostensibly obstructing access to the plank to all employees except those who worked in the pit itself. Wilkerson, a switchman who had no duties in the wheel-pit area, in taking a short cut, crossed over one of the chains and attempted to walk over the plank. He fell and was injured. In his FELA suit, he attributed his injuries to the negligence of the railroad in failing to maintain a safe place to work. The railroad responded by admitting the existence of the greasy plank over the pit and acknowledging that Wilkerson had sustained the injuries he described. The carrier, nevertheless, argues that an alternate safe passage to the other side of the pit was readily available at a very short distance from the plank and that Wilkerson was the real negligent party in using the chained-off plank. The crucial issue was not the question of contributory negligence. Rather, there arose a factual dispute as to whether the construction of the chains across the plank in fact stopped all unauthorized persons from using the plank and thereby absolved the carrier of liability. Wilkerson and another witness testified that, in fact, the chains did not stop anyone from crossing the pit via the greasy plank and that it was a "common practice" to cross the plank even after erection of the chain. 336 U.S. at 58–60 notes 3, 4, 69 S.Ct. 413. Witnesses for the railroad testified to the contrary that, after the chains were put up, only persons working in the pit area on train wheels used the plank. 336 U.S. at 59–60, 69 S.Ct. 413.

Immediately following the sentence which I mistakenly quoted in isolation, Mr. Justice Black added: "Viewing the evidence here in that way it was sufficient to show the following * * *." 336 U.S. at 57, 69 S.Ct. at 415. Then, after an elaborate examination of the facts, as based on testimony by both sides in the controversy, he framed the issue in *Wilkerson* as follows:

"Thus the conflict as to continued use of the board as a walkway after erection of the chains was whether the pit workers alone continued to use it as a walkway [the carrier evidence], or whether employees generally so used it. While this left only a very narrow conflict in the evidence, it was for the jury, not the court, to resolve the conflict."

336 U.S. at 60, 69 S.Ct. at 416. Consideration of this comment framing the issue, in light of the actual review immediately before it of testimony ascribed to witnesses for both sides, makes it apparent that *all* of the evidence was examined, though determination of the sufficiency of Wilkerson's evidence to withstand the carrier's motion necessitated a "look only to the evidence and reasonable inferences which tend to support the case of [Wilkerson] against whom a peremptory instruction has been given." Cf. Blume, *supra* note 5, at 577–578, citing Southern Ry. Co. v. Walters, 1931, 284 U.S. 190, 194, 52 S.Ct. 58, 76 L.Ed. 239. Contrary to my original interpretation of the *Wilkerson* case, *viz.*, that it compelled the trial court to view only the non-movant's evidence, it is but one of a line of cases all applying essentially the same sufficiency test dictated by the Seventh Amendment.

While confessing one error in my opinion for the Court on the original hearing of this case, let me admit another. I erred in stating that "The continued validity of that holding [8] is subject to

---

8. I had just quoted from Reuter v. Eastern Air Lines, 5 Cir. 1955, 226 F.2d 443, 445, 446, the following holding:

" 'In diversity cases, therefore, even since Erie, the scintilla of evidence rule prevailing in Alabama and in some oth-

serious doubt if the standards applied in FELA cases must also be applied in diversity cases." After more thorough research, I entertain *no* doubt that the so-

called "scintilla" test has been firmly rejected by the Supreme Court and other federal courts in all jury cases including FELA cases.[9] This firm rejection is

er states has no application in the federal courts.[6]

[6.] See Herron v. Southern Pacific Co., 283 U.S. 91, 51 S.Ct. 383, 75 L. Ed. 857; White v. New York Life Ins. Co., 5 Cir., 145 F.2d 504, 509; 5 Moore's Federal Practice, 2d ed., Sec. 38.10; 2 Barron & Holtzoff Federal Practice Sec. 1075, p. 759; cf. Pierce Consulting Engineering Co. v. City of Burlington, 2 Cir., 221 F.2d 607, 610.

" 'In determining whether there is sufficient evidence to take the case to the jury, a federal judge performs a judicial function and is not a mere automaton. Gunning v. Cooley, 281 U.S. 90, 93, 50 S.Ct. 231, 74 L.Ed. 720. He must determine, "not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it." Improvement Co. v. Munson, 14 Wall. 442, 448 [20 L.Ed. 867]; see Railway Express Agency v. Mallory, 5 Cir., 168 F.2d 426, 427. "The requirement is for probative facts capable of supporting, with reason, the conclusion expressed in the verdict." Myers v. Reading Co., 331 U.S. 477, 485, 67 S.Ct. 1334, 1339, 91 L.Ed. 1615; see Thomas v. Atlantic Coast Line R. Co., 5 Cir., 223 F.2d 1, 4.' "

9. In Company of Carpenters, etc. v. Hayward, K.B. 1780, 1 Dougl. 374, 99 Eng. Rep. 241, a nonsuit was denied with the observation: "Whether there by any evidence, is a question for the Judge. Whether sufficient evidence, is for the jury." This case has been considered as exemplary of the fact that British courts were originally applying a scintilla standard for determining when an issue was for the jury. Blume, Origin and Development of the Directed Verdict, 48 Mich. L.Rev. 555, 570 (1950). The same rule prevailed in early American decisions. See, e.g., Greenleaf v. Birth, 1835, 9 Pet. (34 U.S.) 292, 299, 9 L.Ed. 132 ("where there is no evidence tending to prove a particular fact, the courts are bound so to instruct the jury, when requested"); Parks v. Ross, 1850, 11 How. (52 U.S.) 362, 372-373, 13 L.Ed. 730 (peremptory instructions serve same purpose as demurrer to evidence and should be tested by same standard; a jury has no right to assume the truth of any ma-

terial fact, without some evidence legally sufficient to establish it); Richardson v. City of Boston, 1856, 19 How. (60 U.S.) 263, 268-269, 15 L.Ed. 639:

"If there be '*no evidence* whatever,' [citing *Parks*] to prove the averments of the declaration, it is the duty of the court to give such peremptory instruction. But if there be *some* evidence tending to support the averment, its value must be submitted to the jury with proper instructions from the court."

The phrases "any evidence" and "some evidence" were semantically interchangeable with what is generally referred to today as the "scintilla" rule. *See* IX Wigmore on Evidence, 3rd ed. § 2494, notes 11 and 12.

The English system, however, one year after *Richardson* was decided by the United States Supreme Court, abandoned the "scintilla" rule in Toomey v. The London, etc., Ry., Co., C.P. 1857, 3 C.B. N.S. 145, 140 Eng.Rep. 694, with the observation:

"A scintilla of evidence, or a mere surmise that there might have been negligence on the part of the defendants, clearly would not justify the judge in leaving the case to the jury: There must be evidence upon which they might reasonably and properly conclude that there was negligence."

*Id.* at 696 (emphasis added). According to Blume, *supra* at 564-565, *Toomey* and Davis v. Hardy, K.B. 1827, 6 B. & C. 225, 108 Eng.Rep. 436, 438 (new trial test), "give us in brief the modern law of involuntary nonsuits."

The United States Supreme Court, in Improvement Company v. Munson, 1871, 14 Wall. (81 U.S.) 442, 20 L.Ed. 867, rejected the "scintilla" rule for the federal courts, holding:

"Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.†

"† Ryder v. Wombwell, Law Reports, 4 Exchequer, 89; Law Reports, 2 Privy Council Appeals, 335.

Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge

illustrated by the authorities collected in footnotes 8 and 9 to the majority opinion herein.

I submit that the FELA standard for sufficiency of the evidence to require submission of the case to a jury is a constitutional standard. There can be no doubt that an action for damages under the FELA is a "suit at common law" as

that expression is used in the Seventh Amendment, for it was early settled that, "The phrase 'common law,' found in this clause, is used in contradistinction to equity, and admiralty and maritime jurisprudence." Parsons v. Bedford, Breedlove & Robeson, 1830, 28 U.S. (3 Pet.) 266, 274 [433, 445] 7 L.Ed. 732.[10] That case has been consistently followed in

was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.‡

"‡ Jewell v. Parr, 13 C.B. 916; Toomey v. L. & B. Railway Co., 3 C. B., N.S. 150; Wheelton v. Hardisty, 8 Ellis & Blackburn, 266; Schuchardt v. Allens, 1 Wallace, 369 [17 L.Ed. 642]." 14 Wall. (81 U.S.) at 448. According to Mr. Justice Black, dissenting in Galloway v. United States, 1943, 319 U.S. 372, 404, 63 S.Ct. 1077, 1094, 87 L.Ed. 1458:

"The rule that a case must go to the jury unless there was 'no evidence' was completely repudiated in Improvement Co. v. Munson, 14 Wall. 442, 447 [20 L.Ed. 867] (1871), upon which the Court today relies in part. There the Court declared that 'some' evidence was not enough—there must be evidence sufficiently persuasive to the judge so that he thinks 'a jury can properly proceed.' The traditional rule was given an ugly name, 'the scintilla rule,' to hasten its demise."

10. The importance of that case justifies a more extensive quotation from Justice Story's opinion for the Court:

"The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy. The right to such a trial is, it is believed incorporated into, and secured in every state constitution in the Union; and it is found in the constitution of Louisiana. One of the strongest objections originally taken against the constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases. As soon as the constitution was adopted, this right was secured by the seventh amendment

of the constitution proposed by congress; and which received an assent of the people, so general, as to establish its importance as a fundamental guarantee of the rights and liberties of the people. This amendment declares, that 'in suits of [sic] common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved; and no fact, once tried by a jury, shall be otherwise re-examinable [sic] in any court of the United States, than according to the rules of the common law.' At this time, there were no states in the Union, the basis of whose jurisprudence was not essentially that of the common law, in its widest meaning; and probably, no states were contemplated, in which it would not exist. The phrase 'common law,' found in this clause, is used in contradistinction to equity, and admiralty and maritime jurisprudence. The constitution had declared, in the third article, 'that the judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and treaties made or which shall be made under their authority,' &c., and to all cases of admiralty and maritime jurisdiction. It is well known, that in civil causes in courts of equity and admiralty, juries do not intervene, and that courts of equity use the trial by jury only in extraordinary cases, to inform the conscience of the court. When, therefore, we find, that the amendment requires that the right of trial by jury shall preserved [sic], in suits at common law, the natural conclusion is, that this distinction was present to the minds of the framers of the amendment. By common law, they meant what the constitution denominated in the third article 'law;' not merely suits, which the common law recognised among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered; or where, as in the admiralty,

later decisions which have made clear that the right of jury trial under the Seventh Amendment does not depend upon the source of the claim, whether from common law or from state or federal statute, but solely on whether the claim should be characterized as legal rather than equitable or in admiralty.[11]

The Supreme Court has held that while the Seventh Amendment does not apply to a FELA action brought in a State court,[12] it does apply to such an action brought in a federal court.[13]

Mr. Justice Douglas, concurring in Harris v. Pennsylvania R. Co., *supra* note 13 said: "The difference between the majority and minority of the Court in our treatment of FELA cases concerns the degree of vigilance we should exercise in safeguarding the jury trial— guaranteed by the Seventh Amendment and part and parcel of the remedy under this Federal Act when suit is brought in state courts." However, the view of the majority of the Supreme Court seems

to be that the Seventh Amendment is not applicable to the States either *ex proprio vigore* or because a "part and parcel of the remedy" under the FELA. *See* Minneapolis & St Louis R. R. v. Bombolis, *supra* note 12. The majority of the Supreme Court bases reversal of directed verdict judgments by State courts in FELA cases not on the Seventh Amendment but on a purpose to assure uniform enforcement of the substantive provisions of the Act. As said in Dice v. Akron, C. & Y. R. Co., 1952, 342 U.S. 359, 363, 72 S.Ct. 312, 315, 96 L.Ed. 398:

"We have previously held that 'The right to trial by jury is "a basic and fundamental feature of our system of federal jurisprudence"' and that it is 'part and parcel of the remedy afforded railroad workers under the Employers' Liability Act.' Bailey v. Central Vermont R. Co., 319 U.S. 350, 354 [63 S.Ct. 1062, 1064, 87 L.Ed. 1444]. We also recognized in that case that to deprive railroad workers of the

a mixture of public law, and of maritime law and equity, was often found in the same suit. Probably, there were few, if any, states in the Union, in which some new legal remedies, differing from the old common-law forms, were not in use; but in which, however, the trial by jury intervened, and the general *regulations in other respects were* according to the course of the common law. Proceedings in cases of partition, and of foreign and domestic attachment, might be cited as examples variously adopted and modified. In a just sense, the amendment then may well be construed to embrace all suits, which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights. And congress seems to have acted with reference to ,this exposition, in the judiciary act of 1789, ch. 20 (which was contemporaneous with the proposal of this amendment); for in the 9th section, it is provided, that 'the trial of issues in fact in the district courts, in all causes, except civil causes of admiralty and maritime jurisdiction, shall be by jury;' and in the 12th section, it is provided, that 'the trial of issues in fact in the circuit courts shall, in all suits, except those of equity, and of admiralty and maritime jurisdiction,

be by jury;' and again, in the 13th section, it is provided, that the trial of issues in fact, in the supreme court, in all actions at law, against citizens of the United States, shall be by jury." 28 U.S. (3 Pet.) at 274, 275 [445, 446].

11. Slocum v. New York Life Ins. Co., 1913, 228 U.S. 364, 378, 33 S.Ct. 523, 57 L.Ed. 879; Luria v. United States, 1913, 231 U.S. 9, 27, 28, 34 S.Ct. 10, 58 L.Ed. 101; Simler v. Conner, 1963, 372 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691.

12. Minneapolis & St. Louis R. R. v. Bombolis, 1916, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961.

13. Jacob v. New York City, 1942, 315 U.S. 752, 753, 62 S.Ct. 854, 86 L.Ed. 1166; Bailey, Adm'x v. Central Vermont Ry., 1943, 319 U.S. 350, 354, 63 S.Ct. 1062, 87 L.Ed. 1444; *see also* Dice v. Akron, C. & Y. R. Co., 1952, 342 U.S. 359, 363, 72 S.Ct. 312, 96 L.Ed. 398; Schulz, Adm'x v. Pennsylvania R. Co., 1956, 350 U.S. 523, 524, 76 S.Ct. 608, 100 L.Ed. 668; Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 508, n. 18, 77 S.Ct. 443, 1 L.Ed.2d 493; *cf.* Harris v. Pennsylvania R. Co., 1959, 361 U.S. 15, 17, 80 S.Ct. 22, 4 L.Ed.2d 1 (Douglas, J., concurring).

benefit of a jury trial where there is evidence to support negligence 'is to take away a goodly portion of the relief which Congress has afforded them.' It follows that the right to trial by jury is too substantial a part of the rights accorded by the Act to permit it to be classified as a mere 'local rule of procedure' for denial in the manner that Ohio has here used. Brown v. Western R. Co. [of Ala.], 338 U.S. 294 [70 S.Ct. 105, 94 L.Ed. 100]."

Since, as we have seen, the Supreme Court itself has settled that the Seventh Amendment applies to a FELA action brought in a federal court, the next question is whether a different kind of jury trial is prescribed by the FELA itself either expressly or implicitly as "part of the remedy." Nowhere in the statute does the word "jury" appear. The reason for that omission is stated in a footnote in Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 508 n. 18, 77 S.Ct. 443, 449, 1 L.Ed.2d 493, which can be best understood in connection with the sentence of the text to which that footnote is appended:

"The Congress when adopting the law was particularly concerned that the issues whether there was employer fault and whether that fault played any part in the injury or death of the employee should be decided by the jury whenever fair-minded men could reach these conclusions on the evidence.[18]

"18. While the primary reason was a protest against undue comment by trial judges as to the facts, the original 1906 Act provided; 'All questions of negligence and contributory negligence shall be for the jury.' 34 Stat. 232. Hearings before Senate Committee on Interstate Commerce on H.R. 239, 59th Cong., 1st Sess. 68–69. The inclusion in the 1908 statute of another provision, 'All questions of fact relating to negligence shall be for the jury to determine,' was proposed but not adopted. The view prevailed that this would be surplusage in light of the Seventh Amendment embodying the common-law tradition that fact questions were for the jury. Hearings before Senate Committee on Education and Labor on S. 5307, 60th Cong., 1st Sess. 8–9, 45–46." [14]

That footnote clearly indicates that the jury trial which is "part and parcel of the remedy" in FELA actions in federal courts is the same jury trial guaranteed by the Seventh Amendment. A similar thought is expressed in Mr. Justice Douglas' concurring opinion in Harris v. Pennsylvania R. Co., quoted, *supra*, 361 U.S. p. 15, 80 S.Ct. 22. Those cases do not stand alone. Other Supreme Court decisions have established that it is the jury trial guaranteed by the Seventh Amendment which is "part and parcel of the remedy" in FELA actions in federal courts.[15] Indeed, it seems an unwarranted affront to suggest that the Supreme Court, by mere fiat, has invented for FELA cases a kind of jury trial found neither in the Constitution nor in the Act.

Moreover, I submit that neither the Congress nor the Supreme Court can constitutionally give a broader role to the jury in FELA cases than that guaranteed by the Seventh Amendment. That is true because of the principle announced by the Supreme Court in a different context in Herron v. Southern Pacific Co., 1931, 283 U.S. 91, 95, 51 S.Ct. 383, 384, 75 L.Ed. 857:

"In a trial by jury in a federal court, the judge is not a mere moderator,

14. The legislative history referred to in footnote 18 to *Rogers*, just quoted, makes it clear that the kind of jury trial intended by the FELA as "part of the remedy" is none other than the Seventh Amendment right of jury trial. Because of its importance, but comparative inaccessibility, that legislative history is attached as Appendix B to this opinion.

15. *See* Jacob v. New York, 1942, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166; Bailey, Adm'x v. Central Vermont Ry., 1943, 319 U.S. 350, 354, 63 S.Ct. 1062, 87 L. Ed. 1444; Schulz, Adm'x v. Pennsylvania R. Co., 1956, 350 U.S. 523, 524, 76 S.Ct. 608, 100 L.Ed. 668; *see also* Atlantic & Gulf Stevedores v. Ellerman Lines, 1962, 369 U.S. 355, 360, 82 S.Ct. 780, 7 L.Ed.2d 798.

but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. This discharge of the judicial function as at common law is an essential factor in the process for which the Federal Constitution provides."

Again, speaking through Mr. Justice Van Devanter in Baltimore & C. Line v. Redman, 1935, 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636, the Court said:

"The right of trial by jury thus preserved is the right which existed under the English common law when the Amendment was adopted. The Amendment not only preserves that right but discloses a studied purpose to protect it from indirect impairment through possible enlargements of the power of reexamination existing under the common law, and to that end declares that 'no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the common law.'

"The aim of the Amendment, as this Court has held, is to preserve the substance of the common-law right of trial by jury, as distinguished from mere matters of form or procedure, and particularly to retain the common-law distinction between the province of the court and that of the jury, whereby, in the absence of express or implied consent to the contrary, issues of law are to be resolved by the court and issues of fact are to be determined by the jury under appropriate instructions by the court.[4]

"[4]. Walker v. New Mexico & So. Pac. R. Co., 165 U.S. 593, 596 [17 S.Ct. 421, 41 L.Ed. 837]; Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 497–499 [51 S.Ct. 513, 75 L.Ed. 1188]; Dimick v. Schiedt, 293 U.S. 474, 476, 485–486 [55 S.Ct. 296, 79 L.Ed. 603.]"

The principle has been most clearly and succinctly expressed by Judge Phillips speaking for the Tenth Circuit in Diederich v. American News Co., 1942, 128 F.2d 144, 146:

"The power of the judge to pass upon questions of law is just as much an essential part of the process of trial by jury at common law guaranteed by the Seventh Amendment, as is the power of the jury to pass upon questions of fact."

Other opinions so indicating are quoted in the margin.[16]

16. " * * * Even where issues of fact are tried by juries in the Federal courts, such trials are under the constant superintendence of the trial judge. In a trial by jury in a Federal court the judge is 'not a mere moderator' but 'is the governor of the trial' for the purpose of assuring its proper conduct as well as of determining questions of law. Herron v. Southern Pacific Co., 283 U.S. 91, 95 [51 S.Ct. 383, 75 L.Ed. 857]. In the Federal courts, trial by jury 'is a trial by a jury of twelve men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinion it is against the law or the evidence.' Capital Traction Co. v. Hof, 174 U.S. 1, 13, 14 [19 S.Ct. 580, 585, 43 L.Ed. 873]." Crowell v. Benson, 1932, 285 U.S. 22, 61, 52 S.Ct. 285, 296, 76 L.Ed. 598.

"In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. Herron v. Southern Pacific Co., 283 U.S. 91, 95 [51 S.Ct. 383, 75 L.Ed. 857]. In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination. * * * Sir Matthew Hale thus described the function of the trial judge at common law: 'Herein he is able, in matters of law emerging upon the evidence, to direct them; and also, in matters of fact to give them a great light and assistance by his weighing the evidence before them, and observing where the question and knot of the business lies, and by showing them his opinion even in matters of fact; which is a great advantage and light to laymen.' Hale, History of the Common

The first FELA passed in 1906 contained a provision that all questions of negligence and contributory negligence shall be submitted to the jury. *See* Appendix B, p. 387, *infra.* In holding that Act unconstitutional, some inconclusive comments were made upon that provision both in Mr. Justice White's opinion for the Court,[17] and in Mr. Justice Moody's dissenting opinion.[18] Profiting from those expressions, the Congress in considering the second or 1908 FELA struck a similar provision following the argument of Senator Rayner. His argument appears in Appendix B at pp. 403–404, *infra,* and is so clear and cogent that I quote from it.

"As to the other clause:

" 'All questions of fact relating to negligence shall be for the jury to determine.'

"I desire to be perfectly frank. I think it ought to go out. Why? Because it does not change the law as it exists to-day, in my judgment, and if it did attempt to change the law it would be clearly unconstitutional. In other words, the seventh amendment protects without any exception whatever, all trials at common law under Federal jurisdiction, as established in England and in this country at the date of the adoption of that amendment.

"It was the prerogative of the court at the date of the adoption of that amendment to charge the jury as to questions of law after considering the facts bearing upon those questions. It was the province of the court to determine whether a case should be withdrawn from the jury by reason of the fact that the plaintiff had not in his evidence brought himself within the terms of the law. It was the province of the court, and it is and must be to-day, to set aside a verdict for want of sufficient evidence Any one of those prerogatives or others that could be mentioned which a provision of the

Law, 291, 292. *Under the Federal Constitution the essential prerogatives of the trial judge as they were secured by the rules of the common law are maintained in the federal courts."* [Emphasis added.] Quercia v. United States, 1933, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L. Ed. 1321.

"The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command —of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury. Jacob v. New York, 315 U.S. 752 [62 S.Ct. 854, 86 L.Ed. 1166]." (Footnotes omitted.) Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 1958, 356 U.S. 525, 537, 78 S.Ct. 893, 901, 2 L.Ed. 2d 953.

"This suit being in the federal courts by reason of diversity of citizenship carried with it, of course, the right to trial by jury. As in cases under the Jones Act (Schulz v. Pennsylvania R. Co., 350 U.S. 523 [76 S.Ct. 608, 100 L.Ed. 668]; Senko v. LaCrosse Dredging Corp., 352 U.S. 370 [77 S.Ct. 415, 1 L.Ed.2d 404]) and under the Federal Employers' Lia-

bility Act (Tennant v. Peoria & P.U.R. Co., 321 U.S. 29 [64 S.Ct. 409, 88 L.Ed. 520]; Ellis v. Union Pacific R. Co., 329 U.S. 649, 653 [67 S.Ct. 598, 91 L.Ed. 572]; Dice v. Akron, C. & Y. R. Co., 342 U.S. 359 [72 S.Ct. 312, 96 L.Ed. 398]; Rogers v. Missouri Pacific R. Co., 352 U.S. 500 [77 S.Ct. 443, 1 L.Ed.2d 493]), trial by jury is part of the remedy. Thus the provisions of the Seventh Amendment, noted above, are brought into play. Schulz v. Pennsylvania R. Co., *supra,* [350 U.S.] at 524 [76 S.Ct. at 609]. As we recently stated in another diversity case, it is the Seventh Amendment that fashions 'the federal policy favoring jury decisions of disputed fact questions.' Byrd v. Blue Ridge [Elec.] Cooperative, 356 U.S. 525, 538, 539 [78 S.Ct. 893, 901, 2 L.Ed.2d 953]. And see Herron v. Southern Pac. Co., 283 U.S. 91, 94–95 [51 S.Ct. 383, 384, 75 L.Ed. 857]." Atlantic & Gulf Stevedores v. Ellerman Lines, 1962, 369 U.S. 355, 360, 82 S.Ct. 780, 784, 7 L.Ed.2d 798.

17. The Employers' Liability Cases, 1908, 207 U.S. 463, 503, 504, 28 S.Ct. 141, 52 L.Ed. 297.

18. Id., 207 U.S. at 540, 28 S.Ct. at 162.

statute of Congress attempted to take from the presiding judge of a Federal court trying a common law case would be in violation of the seventh amendment. The seventh amendment has not added to or taken from the prerogatives of a judge presiding over a court of law a single power that existed at the date of its adoption. It simply preserved the status quo as it then existed, and the authorities on that are perfectly clear."

An FELA case has furnished the formula in most general use by federal courts in all types of cases for determining the absence of a controverted issue of fact. As said in 5 Moore, Federal Practice § 50.02 [1], pp. 2320–2322:

"Until Brady v. Southern Railroad[14]

"14. (1943) 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239.

was decided by the Supreme Court in 1943, the federal courts had not clearly opted between the standard that permitted a court to direct a verdict on the basis of a strong preponderance of the evidence[15] and the 'reasonable

"15. See, e. g., Pennsylvania R.R. v. Chamberlain (1933) 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; McBaine, Trial Practice: Directed Verdicts; Federal Rule (1943) 31 Calif.L.Rev. 454, 460.

man' type of standard indicated above. In the *Brady* case, the Court announced the standard in the following terms:[16]

"16. 320 U.S. at 479–480 [64 S.Ct. at 234–235].

" 'When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial the result

is saved from the mischance of speculation over legally unfounded claims.'

Since that time, although they have used many different formulations, the federal courts have been reasonably consistent in the application of the *Brady* rule, that a verdict may properly be directed when, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict.[17] But where there

"17. The cases supporting this conclusion are almost infinite in number. The citations that follow are extensive but not exhaustive. They provide a sampling of circuits and varieties of factual situations. [Citations omitted.]

is conflicting evidence, or there is insufficient evidence to make only a 'one-way' verdict possible, a directed verdict is improper.[18]

"18. These cases should be read in connection with those in the preceding footnote, since they represent only the other side of the same coin. Again, no attempt has been made to exhaust the authorities. Instead, the cases merely represent an abundant sampling of the authorities among different circuits and with different factual bases. [Citations omitted.]"

In Continental Ore Co. v. Union Carbide & Carbon Corp., 1962, 370 U.S. 690, 696 n. 6, 701, 82 S.Ct. 1404, 8 L.Ed.2d 777, a private antitrust case, the Supreme Court cited an FELA case, Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S. Ct. 409, 88 L.Ed. 520, at two different places in its opinion, as indicating the rule on sufficiency of the evidence for a case to go to the jury.

In at least three diversity cases from this Circuit, the Supreme Court has entered per curiam reversals when this Court has substituted its views of the sufficiency of the evidence for those of the jury.[19]

19. Williams v. Carolina Life Ins. Co., 1954, 348 U.S. 802, 75 S.Ct. 30, 99 L.Ed. 633, *reversing* 5 Cir., 210 F.2d 477; Swafford v. Atlantic Coast Line R. Co., 1955, 350 U.S. 807, 76 S.Ct. 80, 100 L.Ed.

725, *reversing* 5 Cir., 220 F.2d 901; Gibson v. Phillips Petroleum Co., 1956, 352 U.S. 874, 77 S.Ct. 16, 1 L.Ed.2d 77, *reversing* 5 Cir., 232 F.2d 13. This case is discussed by Green, Protection of Jury

It need not be apprehended that juries will get from under *proper* influence or control of trial judges when the FELA standard is applied in diversity cases. That is true for several reasons. First, as has been argued, the extreme results in FELA cases come about because of the substantive elements of the tort rather than from the application of the jury standard. Second, jurors listen to trial judges, and the federal district judges have the power to advise them on the facts.

"In many cases the Supreme Court of the United States has recognized the power of the trial judge to advise the jury on the facts, but has, at the same time, required a clear separation of law from fact, and has insisted that the judge tell the jurors that they were not bound by the judge's opinion of the facts.[48]

Trial in Diversity Cases Against State Invasions, 1957, 35 Tex.L.Rev. 768, with the following conclusion:
"Thus, under the supreme court decision, it would seem that when the right of jury trial in the federal courts collides with Erie v. Thompkins [Tompkins],[6] the Supreme Court as in the

"[6.] 304 U.S. 64 [58 S.Ct. 817, 82 L. Ed. 1188] (1938).

FELA cases will stick with jury trial and not allow local practices of any type designed to deprive a litigant of his constitutional right.[7]

"[7.] Dice v. Akron, C. & Y. R. R., 342 U.S. 359 [72 S.Ct. 312, 96 L.Ed. 398] (1952); Brown v. Western Ry., 338 U.S. 294 [70 S.Ct. 105, 94 L.Ed. 100] (1949); Green, Jury Trial and Mr. Justice Black, 65 Yale L.J. 482 (1956)."

The same per curiam opinion which reversed Atlantic Coast Line R. Co. v. Swafford also reversed an FELA case from this Circuit, Atlantic Coast Line R. Co. v. Anderson, 5 Cir. 1955, 221 F.2d 548.

20. It should be noted that that part of the opinion has not been attacked. Compare Taylor v. Washington Terminal Co., D.C.Cir., Feb. 20, 1969, 409 F.2d 145. Even when the evidence is legally insufficient and hence a motion for directed verdict or judgment n.o.v. may properly be granted, the trial court, in the exercise of a sound discretion, may, in lieu

"[48.] McLanahan v. Universal Ins. Co., 1 Pet. (26 U.S.) 170 [7 L.Ed. 98] (1828); Tracy v. Swartwout, 10 Pet. (35 U.S.) 79 [80, 9 L.Ed. 354] (1836); Games v. Dunn, 14 Pet. (39 U.S.) 322 [10 L.Ed. 476] (1840); Starr v. United States, 153 U.S. 614, 14 S.Ct. 919 [38 L.Ed. 841] (1894); Quercia v. United States, 289 U.S. 466, 53 S.Ct. 689 [698, 77 L.Ed. 1321] (1933); United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223 [78 L.Ed. 381] (1933)."

Blume, *supra* note 7, at 567, 568. Third, as has been discussed in our original opinion in this case, 389 F.2d at 513, 514,[20] the district courts retain extremely broad discretion to grant new trials. In the early days of the common law, the remedy for a jury finding contrary to the evidence was to grant a new trial.[21] That continues to be the safest remedy, less subject to reversal, and encroaching least on the constitutional fact-finding province of the jury.[22] Moreover, it

of directing a verdict or entering judgment n.o.v., simply order a new trial. Cone v. West Virginia Pulp & Paper Co., 1947, 330 U.S. 212, 215, 216, 67 S.Ct. 752, 91 L.Ed. 849; 6A Moore, Federal Practice 2nd ed. ¶ 59.08[5], pp. 3815, 3816 nn. 5–8. Different considerations would probably dictate the use of directed verdict or judgment n.o.v. when the motion is based strictly on an error of law.

21. Blume, *supra* note 7, at 568, 569, citing Macbeath v. Haldimand (King's Bench, 1786), 1 T.R. 172, 99 Eng.Rep. 1036, 1040. Going still further back, Mr. Austin Wakeman Scott, writing in 31 Harvard Law Review 669, 681 on Trial by Jury and the Reform of Civil Procedure, said: "In 1665 the first reported decision was rendered holding that the court might order a new trial on the ground that the verdict was against the evidence," citing Wood v. Gunston, Style 466. Professor Blume also discusses fully and interestingly the "dodo" or no longer used remedy of a demurrer to evidence. Blume, *supra* note 7, at 561, 562.

22. *See* Black, J., dissenting in Galloway v. United States, 1943, 319 U.S. 372, 400, 63 S.Ct. 1077, 87 L.Ed. 1458. It should be noted also that in *Planters, supra*, no error was found in the district court's alternative grant of the defendant's motion for new trial (380 F.2d at 881).

keeps the decision where it belongs, in the hands of the district judge who has seen and heard the witnesses testify and observed their demeanor on the stand. A more general use of new trial instead of directed verdict would save the appellate judges many precious judicial man hours in these days of exploding dockets.[23] Strange to say, however, we do not hear that factor mentioned by appellate court judges when they are reaching out for power to substitute their views for those of the jury.[24]

The burden of controlling jury verdicts rests primarily on the district judges and, except when they substitute their views for those of a jury, interference by the Courts of Appeals should be extremely rare. Even less often should the Supreme Court be called on to review the sufficiency of the evidence. If exercised in many cases it becomes an impossible burden. That has often been noted by the dissenting justices in FELA cases. For example, in Wilkerson v. McCarthy, 1948, 336 U.S. 53, 66, 69 S.Ct. 413, 93 L. Ed. 497, Mr. Justice Frankfurter said:

> "Considering the volume and complexity of the cases which obviously call for decision by this Court, and considering the time and thought that the proper disposition of such cases demands, I do not think we should take cases merely to review facts already canvassed by two and sometimes three

courts even though those facts may have been erroneously appraised."

*See also* Schulz, Adm'x v. Pennsylvania R. Co., 1956, 350 U.S. 523, 527, 76 S.Ct. 608, 100 L.Ed. 668.

I have noted, *supra* note 19, three diversity cases in which the Supreme Court reversed this Circuit per curiam when we sought to substitute our views for those of the jury. However, most such cases never reach the Supreme Court. As said by Mr. Justice Black dissenting in Galloway v. United States, 1942, 319 U.S. 372, 407, 63 S.Ct. 1077, 1096, 87 L.Ed. 1458: "So few of these cases come to this Court that, as a matter of fact, the judges of the District Courts and the Circuit Courts of Appeal are the primary custodians of the Amendment."

On the same page Mr. Justice Black wisely observed that, "Our duty to preserve this one of the Bill of Rights may be peculiarly difficult, for here it is our own power which we must restrain." On the preceding page he had remarked that, "The language of the Seventh Amendment cannot easily be improved by formulas." 319 U.S. at 406, 63 S.Ct. at 1095.[25] On the other hand, Judges both trial and appellate are conscientious in the performance of their duties, and they will follow a formula or standard prescribed by higher authority when it is clear and certain. Such formulas have been evolved in the FELA cases and

---

23. *See e.g.:* Jackson v. Choate, 5 Cir., 1968, 404 F.2d 910, 911 n. 1; Groendyke Transport, Inc. v. Davis, 5 Cir., 1969, 406 F.2d 1158, at 1161, n. 6; Murphy v. Houma Well Service, 5 Cir. 1969, 409 F.2d 804 n. 5.

24. That subject is ably discussed in Wright, The Doubtful Omniscience of Appellate Courts, 41 Minn.L.Rev. 751; and in Green, Jury Trial and Mr. Justice Black, 65 Yale L.J. 482.

25. Mr. Justice Rutledge, writing for the majority, expressed the same thought more elaborately:
> "Finally, the objection appears to be directed generally at the standards of proof judges have required for submission of evidence to the jury. But standards, contrary to the objection's assumption, cannot be framed whole-

sale for the great variety of situations in respect to which the question arises.[31] Nor is the matter greatly aided

"31. Cf. 9 Wigmore, Evidence (1940) 296–299.
by substituting one general formula for another. It hardly affords help to insist upon 'substantial evidence' rather than 'some evidence' or 'any evidence,' or vice versa. The matter is essentially one to be worked out in particular situations and for particular types of cases. Whatever may be the general formulation, the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked."
[The Wigmore text is most instructive.] 319 U.S. at 395, 63 S.Ct. at 1089.

especially in Lavender v. Kurn, *supra,* formulas which are of inestimable aid to the district judges and the judges of the Courts of Appeals as "the primary custodians of the Amendment." 319 U.S. at 407, 63 S.Ct. at 1096. We grievously err when we discard those formulas in diversity cases.

To recapitulate, I submit that the same standard of sufficiency of the evidence to require submission of a case to the jury applies in diversity cases as in FELA cases, for the following reasons: (1) The extreme results reached in FELA cases is because of the substantive elements of the tort, and not because of any difference in the standard of sufficiency of the evidence to preserve the right of trial by jury; (2) an action under the FELA is a "suit at common law" as that expression is used in the Seventh Amendment, and carries the right of jury trial under that Amendment; (3) the kind of jury trial intended by the FELA as a "part and parcel of the remedy" is none other than the Seventh Amendment right of jury trial; (4) we cannot assume that the Supreme Court, by mere fiat, has invented for FELA cases a kind of jury trial found neither in the Act nor in the Constitution; (5) neither the Congress nor the Supreme Court can constitutionally give a broader role to the jury in FELA cases than that guaranteed by the Seventh Amendment; (6) the Supreme Court and other federal courts have applied the FELA standard in diversity cases and

other kinds of cases; (7) trial judges retain adequate influence over and control of juries through their admitted powers to advise on the facts and to grant new trials; (8) the formulas evolved in the FELA cases and especially in Lavender v. Kurn, *supra,* operate to restore the historic common-law function of the jury in passing on disputed questions of fact.

## III.

## "THE SUBSTANTIAL EVIDENCE OR REASONABLE MAN TEST"

Sitting en banc, a majority of this Court "promulgate[s]" what it considers to be *"the* standard" (emphasis added) for determining the sufficiency of evidence necessary to require submission of a case to the jury. For three reasons, I disagree with this newly promulgated formula.

First, the majority expressly overrules the Supreme Court's own sufficiency test set out in Lavender v. Kurn, *supra,* 327 U.S. at 653, 66 S.Ct. 740, and rejects Planters Mfg. Co. v. Protection Mut. Ins. Co., 5 Cir. 1967, 380 F.2d 869, 874, which adopted the Lavender standard.[26] The majority, in so doing, commits constitutional error, for the *Lavender* test represents but one articulation of several constitutional formulas used by the Supreme Court.

Second, the majority simply has no authority to "promulgate" any one standard when the Supreme Court itself has prescribed a number of them,[27] and has

26. The majority seems concerned with the "complete absence" language present in both *Lavender* and *Planters.* The *Lavender* decision stated: "Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. * * *" 327 U.S. at 653, 66 S.Ct. at 744. *Planters* holds: "It is only when there is a complete absence of probative facts to support the conclusion reached that the jury's judgment may be ignored." 380 F.2d at 874. It is submitted that "complete absence" must be read in context with the phrase "of *probative* facts" immediately following it; and, so read, whatever misapprehensions the majority may have appear unfounded.

27. The Supreme Court, in FELA cases, has articulated the test in several ways, for example:
    (a) "Where * * * the case turns on controverted facts and the credibility of witnesses, the case is peculiarly one for the jury." Ellis v. Union P. R. Co., 1947, 329 U.S. 649, 653, 67 S.Ct. 598, 600, 91 L.Ed. 572.
    (b) "[Evidence of] probative facts from which the [substantive law elements] could reasonably be inferred." Tennant v. Peoria & P. U. R. Co., 1944, 321 U.S. 29, 32, 64 S.Ct. 409, 411, 88 L. Ed. 520.
    (c) *See* Lavender v. Kurn. *supra.*
    In two non-FELA cases, the Supreme Court has indicated that the same stand-

left the door open for further formulas to be developed.[28]

As has been mentioned, *supra* pp. 389–390, perhaps the most concise and well-accepted Supreme Court explanation of the standard is contained in Brady v. Southern R. Co., 1943, 320 U.S. 476, 479–480, 64 S.Ct. 232, 88 L.Ed. 239. *See* 5 Moore, Federal Practice ¶ 50.02 [1], p. 2320 (2d ed. 1968) (noting that "the federal courts have been reasonably consistent in the application of the *Brady* rule.")

The wisdom of our forefathers embodied in the Seventh Amendment is expressed in a single sentence. Its limits are stated as "the right of trial by jury" to be re-examined only "according to the rules of the common law." Many formulas have been used in the past and more will be employed in the future to explain the meaning of those phrases. No "promulgation" of this Court can limit the freedom of thought and expression of the district judges, and it is sheer folly for us to make such an effort. I cannot help wondering what this Court would do should some independent-minded district court judge choose to follow one of the Supreme Court statements of the standard instead of *the* standard announced by the majority. There is nothing we *could* do and we should never assume such an untenable position by adopting a single formula.

Third, I disagree with the new standard "established" by the majority because it is at least misleading in its use of the term "substantial," if it is not erroneous. The word "substantial," used in its legal sense, can equally well connote either a *qualitative* or a *quantitative* meaning. This distinction was implicitly recognized and effectively avoided by the decision in *Planters*. *See* 380 F.2d at 874. In closing, too, I note that, notwithstanding all the variations which the Supreme Court has played on its sufficiency theme, I have been unable to find a single instance in which the Supreme Court has used "substantial"[29] in any of its

---

ard applies as well to both types of cases:

(a) "All of the evidence * * * does not point in one direction and different inferences might reasonably be drawn from it." Continental Ore Co. v. Union Carbide & Carbon Corp., 1962, 370 U.S. 690, 700, 82 S.Ct. 1404, 1411, 8 L.Ed.2d 777.

(b) "*Mere* speculation be not allowed to do duty for probative facts." [Emphasis supplied.] Galloway v. United States, 1943, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458.

Also noteworthy is the fact that the Supreme Court has relied heavily upon two decisions ante-dating the FELA as illustrative of the historic standard for determining sufficiency of the evidence to send a case to the jury. *See* Wilkerson v. McCarthy, 1948, 336 U.S. 53, 62, 71, 69 S.Ct. 413, 93 L.Ed. 497 (opinions of Mr. Justice Black and Mr. Justice Douglas), both opinions citing Jones v. East Tenn., V. & G. R. Co., 1888, 128 U.S. 443, 445, 9 S.Ct. 118, 32 L.Ed. 478 ("jury is made the tribunal to decide disputed questions of fact") and Washington & Georgetown R. Co. v. McDade, 1890, 135 U.S. 554, 572, 10 S.Ct. 1044, 1049, 34 L.Ed. 235 (sufficient for jury when "facts are in dispute, and the evidence in relation to them is that from which fair-minded men may draw different inferences.")

Many of the various formulas used by the Supreme Court and by inferior courts in non-FELA cases are collected in the cases cited in note 15 to the majority opinion and in the text to which that note is appended.

28. In this connection, it is respectfully submitted that about as good a rule as any for the granting of a motion for directed verdict is the familiar standard for granting a summary judgment; that is, to "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.; *see* 3 Barron & Holtzoff § 1234 n. 75, p. 133; 5 Moore, Federal Practice ¶ 56.04 [2], p. 2066.

29. The Supreme Court does employ "substantial" in stating the test for sufficiency of the evidence to sustain a verdict of guilt in criminal cases: "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680. It is significant that both the quality and the quantity of the evidence are taken into consideration in applying that

articulations of the constitutional standard.

What then do I offer as an alternative to the majority formula? With the Supreme Court I must conclude that "the mere difference in labels used to describe this [sufficiency] standard * * * cannot amount to a departure from 'the rules of the common law' which the [Seventh] Amendment requires to be followed." Galloway v. United States, 1943, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458.

While some may consider a single formula for the standard to be laudable in the name of uniformity, I think it is unnecessary. I seek to achieve the *purpose* of the Seventh Amendment—reservation of the resolution of factual disputes to the jury alone—not to establish one or more preferable formulas for the standard. And this purpose is perhaps best amplified in the language of *Lavender* and *Planters*. If I had to choose a single formula, my choice would lie among three: (a) the language of *Lavender;* (b) the *"Brady* rule," quoted heretofore on pages 389-390 and again referred to on page 393; (c) the same formula as that for granting a summary judgment, quoted in footnote 28, *supra.*

## IV.

## CONSIDERATION OF THE MERITS

I concur in the judgment of affirmance, but for the reasons expressed in the original *Boeing* opinion.

## CONCLUSION

To correct our previous errors, the Court should modify *Boeing* to the extent that it incorporates a misconception of Wilkerson v. McCarthy, *supra,* with respect to what evidence is reviewed, should withdraw the expression of doubt as to the continued validity of the holding in Reuter v. Eastern Air Lines, *supra,* and should reiterate the fundamental validity of Planters Manufacturing Co. v. Protection Mut. Ins. Co., *supra.*

test in criminal cases. That was developed at some length in Riggs v. Unit-

I therefore concur in part and dissent in part.

## APPENDIX A

### FACTS

Daniel C. Shipman, at the time of trial, was 47 years old, married for twenty years, and the father of six children. (R. 49–50, 331). Prior to his employment with Boeing, he had established a record of regular employment for over thirty years,[5] with only two interrup-

5. From 1936 through 1955, he was employed by Firestone Tire & Rubber Co. in several machine shop capacities, including supervisory positions. (R. 51–53). This employment was briefly interrupted by service with the U.S. Coast Guard from 1942–1944 and again in 1952. (R. 52–53). Following a 1955 industrial injury, he owned Master Craft Boats, a Tampa boat-building enterprise employing 25 or more employees, from 1956–1958. (R. 53, 54, 149). He moved in 1958 to Huntsville, Alabama, where he owned from 1959–1962 Custom Wood Products, a cabinet making firm which employed 10–12 craftsmen. (R. 54). During the same period, he also worked part-time for KVK Corp., a woodwork manufacturer. (R. 54–55). After selling his business, he took a position as shop foreman and machine supervisor for TEC Productions, a subcontractor for NASA equipment work. (R. 56). He quit his job after 1½ years because of personal difficulties with his supervisor. (R. 463). Immediately thereafter, he was employed as a precision scale model maker by Hayes International from August 1964 until December 17, 1964, the day before he commenced working for the Boeing Company.

tions: a 1955 industrial back injury which required surgical correction (R. 57–58) and a one-week hospitalization in May 1964 stemming from chronic acute bronchitis. (R. 59, 259). His family doctor had first treated his bronchitis in 1961. (R. 259, 296, 308).

Although he had spent his entire working life around machine shops, the evidence of his pre-Boeing experience and proficiency as a spray painter was in

ed States, 5 Cir. 1960, 280 F.2d 949, 953, 954, 955.

serious conflict.[6]   However, considering

[6.] Boeing introduced Shipman's pre-employment job résumé (Def. Ex. #1) which contained the following special comment: "Throughout my past years of employment I have had experience in any type of paint and spray equipment." (R. 152–154). In addition, Boeing witness McDonald, Shipman's supervisor at TEC Productions, described him as his "best qualified" spray painter. (R. 456–458). McDonald stated that Shipman had painted 40–50 hours over a 1½ year period with TEC. (R. 462). Shipman, himself, disputed any significant prior spray painting experience, knowledge or proficiency, stating that he was familiar with the equipment only as a "mechanical item" (R. 118) and that the most he had ever spray painted was "five or ten minutes at a time, showing someone * * * what I wanted done * * *." (R. 118, 147, 153). He refuted the résumé statement as having been written by Ed Lawrence, his Boeing supervisor, who was "trying to get me in because he didn't have an opening in my qualification." (R. 152). Lawrence denied any such authorship. (R. 411).

all evidence presented, it would appear that any pre-Boeing spray paint experience was minimal and secondary when compared with his principal previous responsibilities as a machinist, model maker, and shop foreman.

Irrespective of his prior spray painting experience, Shipman was hired by Boeing, at least nominally, as a "special project mechanic," with responsibilities for building precision panels and performing general machine shop work. (R. 60, 317).[7]  In actuality, he worked solely (R.

[7.] Boeing, in its answer to written interrogatories, described Shipman's job as Special Project Mechanic "A" and his duties and responsibilities as: "Working with planning, developing, fabricating, assembling and operational checking of mechanical, hydraulic and structural systems to be incorporated in mobile training devices and other special projects." (Plaintiff's Ex. #9, R. 317).

61, 79) or almost entirely (R. 412–413) as the only (R. 112) spray painter in Boeing's 20–30 man Huntsville, Alabama, model shop (R. 61), from December 18, 1964, through March 8, 1965. (R. 50).[8]

[8.] Shipman left work on the afternoon of March 8, 1965, was hospitalized that

evening (R. 106–110); and, except for two brief reappearances at the model shop in April and May (R. 452, 455–456), he never returned to work. Boeing formally terminated his employment on July 23, 1965. (R. 51, 317).

Shipman's regular work week was 40 hours. (R. 61). Boeing records reflected Shipman worked a total of 434 regular hours plus 29 hours of overtime during the 3½ month period (R. 186); Shipman, however, stated that he had averaged approximately 18½ hours of overtime per week (R. 79, 107), a claim rejected by his Boeing supervisor (R. 439).

*The Working Areas*

The Boeing model shop was located on the third floor of a converted mill-type structure and measured approximately 30x85 feet. (R. 61–62, 65). Within the shop was about a 12x15 to 20x20 foot area marked off by yellow lines on the floor and designated as the spray painting area. (R. 69, 85, 451). This area contained an approximately 6x6x8 foot, standard production model, three-sided DeVilbis spray paint booth with an open front. (R. 94, 414; photograph, Def. Ex. #3).

The entire model room was forced-air fed for hot or cool air conditioning by means of an overhead duct work system with 24x6 inch grilled outlets. (R. 143, 474). Shipman remembered only three to four outlets in the system, one of which was located approximately 40–50 feet away from him. (R. 142–143). Boeing diagrams and testimony indicated the system had six such outlets. (Def. Ex. #11, R. 474). Shipman recalled five or six doors, one of which was in his working area, leading out of the main model shop. (R. 143). With the exception of one 16x16 inch fresh air damper leading from the roof, the air was under pressure and escaped only if the door leading into the lobby was open. (R. 474, 475).

The spray paint booth was rear-end fan-exhausted to the outside atmosphere by means of a 16–18 inch pipe leading through a window. (R. 94–95, 414, 468–469). Fan size estimates varied from

unknown by Shipman (R. 94) to 24 inches by a Boeing witness R. 468).

In addition, Shipman was directed by his supervisor (R. 97, 99), with the cognizance of the fire marshal (R. 98–99, 444), to paint railings in a back room he said was unlighted, unheated, and unventilated. (R. 74, 97). Shipman stated that the back room painting job required "a couple of hours at a time two or three times two different days." (R. 98). His supervisor countered that the task required only one day in late January (R. 432–433), that the room could be ventilated by a bank of windows opened by a single means (R. 431; see R. 475), and that Shipman on the particular date painted for only 30 minutes with a fan in the room directed toward some broken out windows. (R. 431).

*The Equipment; Painting Procedure*

Shipman used an air-operated, one-quart capacity, production type spray gun (R. 89), a type commonly used in industry. (R. 89, 413). His method of operation was to suspend the article to be painted on a wire stretched across the open front of the spray booth (R. 96, 415) or enter the booth itself (R. 97) and to spray toward the filter panels along the rear of the booth. (R. 110). Provided the article to be sprayed was small enough and the exhaust fan was *on*, the excess paint and fumes sprayed should have been removed from the model shop environment. (R. 110, 416, 430).

Shipman claimed, however, that he painted more items larger than the booth could accommodate than he did booth-sized items (R. 79–81, 102, 146). Moreover, he claimed that he had been instructed by his supervisor on several occasions to paint with the booth exhaust fan purposely shut off so as not to draw machine dust into the booth and onto the paint surface. (R. 101). His supervisor rebutted, however, that while Shipman may have painted in the booth with the fan off, he never did so more than two minutes. (R. 425). Furthermore, the general practice was for Shipman to turn on the fan as he began to spray paint an item. (R. 417). He stated that Shipman had occasionally been instructed to turn off the fan *after* he had finished painting in order to avoid drawing machine shop dust over the freshly painted items drying in the booth. (R. 426). Moreover, the supervisor stated most of the spray painting Shipman did was on instrument panels for NASA and the Marshall Space Flight Center which averaged 2 x 19 x 24 inches in dimension and were painted in the booth. (R. 412–413; see Def. Ex. #8, 9, panel work orders).

Shipman's actual time spent spray painting for Boeing was estimated from as low as two to three hours a day (by his supervisor) (R. 427) to all day with only momentary cleaning and preparation breaks (by Shipman) (R. 139–140).

Two major equipment issues are critical: was a face mask available or necessary and were gloves provided for use when handling chemicals harmful to the skin? Shipman alleged and testified that he used a charcoal filter mask for the first week (R. 103); but that after it clogged and became useless, he was unable to obtain anything other than an ineffective dust mask. (R. 104). Boeing witnesses testified that approximately eight replacement spray masks were available in a nearby tool crib (R. 349, 422, 446–447); that no shortage existed and, if one had, it could have been remedied within a day by local purchase (R. 349–350, 422); that if Shipman did request a mask, he was referred to the tool crib (R. 420); and that the crib worker never remembered him even making a request. (R. 349). His supervisor asserted that Shipman never complained that a mask was unavailable. (R. 420).

Shipman further claimed that only two types of protective gloves were supplied by Boeing: a worn out pair for handling harmful chemicals and polyethylene (Saran Wrap-type) gloves to prevent skin oil rubbing off on fresh paint. (R. 103–105). He stated that he had asked for protective gloves (R. 104), had been turned down for lack of

local purchase money (R. 106) with a promise, never kept, to order some (R. 166-170). · The supervisor and tool crib operator both replied that gloves were available (R. 350, 423-24, 447); and the supervisor stated that Shipman had worn gloves on occasion. (R. 423).

Another equipment item about which Shipman complained was the enamel paint drying oven used during test conducted because of a paint quality control problem. (R. 114-115). On opening the oven, paint fumes were said to literally take away the operator's breath, make him cough, and cause headaches. (R. 117). The oven was not ventilated. (R. 118). Boeing never chose to rebut this complaint.

In addition, Shipman commented that he had to use his hands or a little swab to letter the engravings on instrument panels. (R. 92, 188). One of the major premises of his action was that these white and red filler paints contained *lead* which was expressly called for by the specifications and work orders. (R. 92). Boeing never addressed itself to how Shipman performed the engraving filler painting task, but effectively denied that the paints contained lead. (R. 353-354); see Def. Ex. #9 at p. 6). A Boeing witness read into the record the engraving instructions for the filler paint composition: "After engraving, the groove lettering and marking shall be filled with an *oil base paint.*" (R. 354).

Finally, testimony revealed that surplus chemicals (mainly cleaners) were kept in a ground floor bulk storage room (R. 186) in various size containers, including 55 gallon drums. (R. 86, 186, 231). The room was poorly ventilated, according to a fire safety inspection report made by a Boeing employee. (R. 230). Moreover, the only apparent means of extracting liquid chemicals from the large 55 gallon drums was by siphon hose. (R. 86, 186, 231, 251).

*The Ailments*

On March 8, 1965, shortly after 4 P.M., Shipman requested permission to go home as he was not feeling well. (R. 108). Upon reaching home, he was sick, vomited, fainted, and was taken to Huntsville Hospital. (R. 109). Dr. Huber, the family physician who had previously treated him since 1961 for acute bronchitis, treated him March 8, 1965, and off and on thereafter. (R. 264). He was also treated by a number of other specialists.[9]

9. Shipman was released by Dr. Huber after one week, but readmitted in April and May. (R. 122-124). He spent three weeks in August in a TB Sanitorium in Decatur, Alabama (R. 124-128); then transferred to a Birmingham hospital for a series of lab tests and X-rays. (R. 127-128). He was readmitted to Huntsville Hospital in November 1965, referred to Dr. Morton, a psychiatrist and neurologist (R. 128), returned to the Birmingham hospital. (R. 130-131). Finally, he was admitted to Bryce Hospital, Tuscaloosa, Alabama, a mental institution, in March 1966. His hospital and physicians fees, as well as his estimated expenditures on drugs, appear at R. 135, 137.

Dr. Huber, a chest specialist, diagnosed his ailments as aggravation of the pre-existing acute bronchitis caused by smoking and inhalation of toxic fumes, dust, or even house dust (R. 313, 314) and polyneuritis (muscle weakness), cause unknown, with no medical evidence to support a theory of lead poisoning. (R. 313). Dr. Huber did, however, amplify his original medical record entry of "polyneuritis, etiology unknown" to include an observation that it was "presumptively due to toxic substance encountered at work," (R. 290) though he did not think his toxic exposure was acute. (R. 297-300). Dr. Morton, a psychiatrist and neurologist, in October 1965 and the Spring of 1966, diagnosed Shipman's continuing adverse reaction as psychoneurosis, anxiety state (fear of lead poisoning) on the basis of uncorroborated neuropsychiatric examination of and personal consultation with Shipman. (R. 376). He admitted that he had "no information on lead [lab] studies" run on Shipman (R. 378, 398-399), that Shipman had not revealed his history of acute bronchitis (R. 401), and that his only suspicion of possible

lead poisoning was based on Shipman's statement that some of the paints he had used contained lead. (R. 397). Both Dr. Huber and Dr. Morton recognized that sustained exposure to more than 0.2 milligrams per cubic meter is necessary to cause lead poisoning. (R. 312, 400). Moreover, Dr. Huber admitted that Shipman's 24-hour urine test (recognized lead poisoning lab test) report of March 11, 1965, revealed no trace of any common metallic poisoning. (R. 265–266, 310).

Dr. Huber recalled the cracked condition of Shipman's hands, but could not remember prescribing any medication for it. (R. 269). A fellow employee, however, had remembered referring Shipman to the company nurse for treatment of his hands. (R. 225). Shipman's wife stated that she had applied to his hands an ointment prescribed by a dermatologist, Dr. Holliman (R. 334). Her discussion of his skin problem was quite descriptive, as were her comparisons of his mental disposition before and after working for Boeing. (R. 336–339). Her characterization of Shipman's post-Boeing condition was summarized as follows: nervousness, anxiousness, more often angry, able to do very little around the house and yard, and poor in his eating and sleeping habits. (R. 342–343). Basically, "he just didn't seem himself." (R. 342).

Although Shipman sought other employment as early as May 1965, he was unsuccessful. (R. 207, 208–209, 218–219, 340–341).

## APPENDIX B

[LEGISLATIVE HISTORY, ORIGINALLY CITED IN *ROGERS v. MISSOURI PACIFIC R. CO.*, 1957, 352 U.S. 500, 508, n. 18, 77 S.Ct. 443, 1 L.Ed.2d 493, AND REFERRED TO ON PAGE 386 in n. 14 OF THIS OPINION]

### LIABILITY OF EMPLOYERS.

---

### HEARINGS

Before The

### COMMITTEE ON INTERSTATE COMMERCE

Of The

### UNITED STATES SENATE,

Having Under Consideration the Bills (H. R. 239, S. 156, and S. 1657) Relating to Liability of Common Carriers by Railroads in the District of Columbia and Territories and Common Carriers by Railroads Engaged in Commerce Between the States and Between the States and Foreign Nations to Their Employees.

---

May 3 to 8, 1906.
Fifty-Ninth Congress, First Session.

———◆———

Washington:
Government Printing Office.
1906.

\*   \*   \*   \*   \*   \*

Mr. Wharton says that this was a part of the law of Rome "when Rome embraced all civilization," and that the law of Rome—is the product of a practical and regulative jurisprudence, based, by the tentative processes of centuries, on humanity as it really is, and so framed as to form a code for a nation which

controlled in periods of high civilization the business of the globe.

The following quotation is taken from a book issued by the State of Pennsylvania in the year 1901, and entitled "The Legal Relations between the Employed and Their Employers in Pennsylvania, Compared with the Relations Existing between Them in Other States," page 181:

Some States have attempted to establish another rule that merits consideration. It is an attempt to measure or compare the negligence on both sides, and then award judgment in favor of the least culpable. This doctrine has been scouted at in Pennsylvania, but it has been adopted in Illinois and Georgia, and is gaining ground. Such a strong principle of justice underlies it that it commends itself to many.

Beach, in defining the doctrine of comparative negligence, says:

Reduced to a canon, it amounts to this: Slight negligence on the part of the plaintiff * * * is not a defense to gross negligence on the part of the defendant.

Shearman and Redfield on the Law of Negligence, fourth edition, 57, define the degrees of negligence thus:

Gross negligence is want of slight care; ordinary negligence is want of ordinary care, and slight negligence is want of great care.

In Louisville, etc., R. Co. v. Robinson (4 Bush, 507, 509), in defining gross negligence, Chief Justice Robertson, of Kentucky, said:

Gross neglect is either an intention to wrong or such a reckless disregard of security and right as to imply bad faith, and therefore squints at fraud and is tantamount to the magna culpa of the civil law, which in some respects is quasi criminal.

Mr. Chairman, we believe our proposition is fair. It makes each man who is guilty of negligence responsible for what negligence he has been guilty of, and we think that is no more than right. We believe also that if it is enacted into law it will not only give employees greater rights in the courts, but will also tend to lessen the number of accidents, for if railroad companies are held to account for their gross negligence where heretofore they have been allowed to go free it will cause them to throw greater safeguards around the lives and limbs of their employees.

MR. GILLETT. Do I understand you that the amendments you suggested this morning are intended to cover the law of these States that you have just referred to?

MR. FULLER. Yes, sir; with this provision added, that all questions of negligence and contributory negligence shall be submitted to the jury.

MR. GILLETT. That is all right.

MR. FULLER. Under the Constitution we have that right now.

MR. GILLETT. It is the law now.

MR. FULLER. But some of our judges seem to think they have not enough duties to perform without helping the jury out, and they have arrogated to themselves the duty of passing upon questions of contributory negligence as questions of law rather than questions of fact.

MR. BIRDSALL. How does your proposed amendment help that proposition?

MR. FULLER. We say that all questions as to contributory negligence shall be submitted to the jury.

MR. BIRDSALL. Is it not a question for the courts to say whether there is a question of that kind to be submitted?

MR. FULLER. We have understood that is a question for the jury to find out, whether there is contributory negligence or not.

MR. TIRRELL. The courts generally, where they have taken the case from the jury, have said that there was no evidence to sustain the case of the plaintiff.

MR. FULLER. As I understand it now, the Constitution requires that questions of fact shall be submitted to the

jury and that the citizen is entitled to have a jury pass upon them.

MR. GILLETT. You think that this will help the bill?

MR. FULLER. I think so. I think if that statute is put before a judge and plead by counsel for the plaintiff it will have some effect.

The object of section 3 of this bill is to prevent the master from releasing himself from his liability under sections 1 and 2 through contracts of employment and insurance. Unless this be done the object of this whole legislation would fall flat, for the reason that the railroad companies before employing a man would make him sign a contract agreeing to relieve them from liability for injury.

Train baggage masters, in addition to their regular duties performed for railroad companies, are also often required to handle express, and the following is a sample of the release contracts which they are required to sign. I will only quote a few extracts from these contracts and will submit the whole contract as a part of my testimony. This is from an application of the American Express Company:

And whereas such express company, under its contracts with many of the corporations and persons owning or operating such railroad, stage, and steamboat lines, is or may be obligated to indemnify and save harmless such corporations and persons from and against all claims for injuries sustained by its employees:

Now, therefore, in consideration of the premises and of my said employment, I do hereby assume all risk of accidents and injuries which I shall meet with or sustain in the course of my employment, whether occasioned or resulting by or from the gross or other negligence of any corporation or person engaged in any manner in operating any railroad or vessel, or vehicle, or of any employee of any such corporation or person, or otherwise, and whether resulting in my death or otherwise.

He has got to agree to release the railroad company from gross negligence.

MR. CLAYTON. Has any court upheld that sort of an enactment?

MR. FULLER. Yes; they have upheld that sort of an agreement. It has been upheld by the Supreme Court of the United States.

[Reading:]

And I do hereby agree to indemnify and save harmless the American Express Company of and from any and all claims which may be made against it at any time by any corporation or person under any agreement which it has made or may hereafter make, arising out of any claim or recovery upon my part, or the part of my representatives, for damages sustained by reason of my injury or death, whether such injury or death result from the gross negligence of any person or corporation, or of any employee of any person or corporation or otherwise.

## LIABILITY OF
## COMMON CARRIERS TO EMPLOYEES

### HEARINGS

Before the Committee on Education and Labor,
United States Senate

ON THE BILL (S. 5307)

Relating to Liability of Common Carriers to Their Employees

Washington
Government Printing Office
1908

\*     \*     \*     \*     \*     \*

It seemed to us to be a bill covering several jurisdictions, and that it was more a labor question than a judicial or a commerce question, and that it is the proper place for it in this committee. We have presented no arguments before the Judiciary Committee because that committee has not before it the bill which we desire. We are not in favor of the Knox bill.

SENATOR RAYNOR. Let me ask you a question.

MR. FULLER. I will be very glad to answer it if I can.

SENATOR RAYNOR. I can be here for only a few minutes this morning. I am on the Judiciary Committee. I was not on it last year. I voted for the bill of Mr. La Follette's with the suggestion to him at the time I cast the vote that I thought the bill would be pronounced unconstitutional on the ground upon which the court afterwards pronounced it unconstitutional. But the Senator had an idea that perhaps they would decide otherwise.

I have just looked over the bill. I want to call your attention to two or three things in it. You say you had this bill framed by capable lawyers. You want a bill which, if passed at all, will be good. You do not want a bill that will be pronounced unconstitutional again.

MR. FULLER. Undoubtedly not.

SENATOR RAYNER: I want to call your attention to one or two things in the bill. Look at the first section, the last three lines on the first page. This is without going into the merits of the controversy at all, but just to bring to your attention what appear to me to be patent defects on its face. You go on to provide that every common carrier who is engaged in commerce between the several States, and so forth, shall be liable, and then on the third line from the bottom of the page you say "and,

if none, then of the next of kin dependent upon such employee, for all such injuries or death."

Now, you started with the original bill that went before the Supreme Court. The Supreme Court passed upon the bill that you prepared, which provided that the parent or next of kin, whatever it may be, might recover for all damages resulting from such injury or death. Now you propose to give them the absolute right to recover for the injury or death, whether there was any damage or not. If you will look at the original bill that the Supreme Court passed upon, you will find that it used this language. Have you the Supreme Court decision there?

MR. FULLER. No, sir.

SENATOR RAYNOR. I have it before me. "You may recover for all damages which may result," and so on. There is not a word here that gives you an absolute right to recover. It would embrace a class of cases that the State courts have consistently held you can not recover for. It would cover a class of cases for the loss of society and the loss of affection. You must recover, I apprehend, on some ground of pecuniary damages. That is an important point.

There are just three things that strike me, which I will mention without going into details. Look at page 3 of the bill, lines 22 and 23:

All questions of fact relating to negligence shall be for the jury to determine.

That is a very ambiguous provision. You did not have anything of that sort in the original bill?

MR. FULLER. Yes, sir. A broader provision.

SENATOR RAYNER. I beg pardon. It provided that "all questions of negligence and contributory negligence shall be for the jury;" and the court says in reference to the original bill:

We further deem it unnecessary to express an opinion concerning the alleged repugnancy of the statute to the seventh amendment, because of the provision of

the act as to the power of the jury. In saying this, however, we must not be considered as intimating that we think the provision in question is susceptible of the construction placed on it in argument, or that if it could be so construed it would be constitutional.

The seventh amendment of the Constitution of the United States regulates that. Why do you put anything in the bill at all when you have the seventh amendment providing for a jury trial in reference to any matter involving over $20? Why not just leave that under the Constitution without trying to construe the Constitution?

MR. FULLER. Without wishing to speak now of any provision in the bill that is different from the law that was passed, I will say—

SENATOR RAYNER. But it is the seventh amendment. I do not know what is the practice in other States, but I apprehend it is the practice in every State that where there is no negligence the court instructs the jury that there is no negligence.

MR. FULLER. I will just say, without entering into any argument as to that provision in the bill or any other, the object was to prevent courts, especially in some jurisdictions, from assuming to themselves the right to pass upon questions of fact that ought to go to the jury.

SENATOR RAYNER. But it is a question of fact. If there is no negligence and no evidence at all you want to put it into the hands of a jury.

MR. FULLER. But in the higher courts ultimately it was decided to be a question of fact and ought not to have been taken from the jury.

SENATOR RAYNER. The court will have to pass upon the constitutionality of this bill. I voted for the bill originally. I do not know what I will do in regard to this bill.

Let me call your attention to another proposition. All these are new provisions. In other words, instead of presenting a bill to Congress to meet the decision of the Supreme Court you have half a dozen new questions here that you submit to the Supreme Court. Look at line 18 on page 3. You had no such provision as that in the original bill. It is a very dangerous provision:

*Provided,* That no such employee, who may be injured of [sic] killed, shall be held to have been guilty of contributory negligence in any case where the violation of law by such common carrier contributed to the injury or death of such employee.

That is an entirely new provision. Look at it for a moment. My practice has been limited to cases for defendants. I do not take any of these damage cases, although there is no reason why I should not if I wanted to do it. Let me give you this case, which has occurred over and over again. Some of the employees of the railroad, young men and boys, were injured when the cars were standing on the street against a city ordinance. The city ordinance prohibited them from standing on the street for more than a certain length of time. They were over the time. These young men who were in the employ of the railroad (I do not know what they were doing, but in some employ of the railroad) amused themselves by running in under the cars and running back under the cars.

\* \* \* \* \* \*

\* \* \* gross that negligence may have been. Is it fair, is it just, not only to the carrier, but to the public, to say if a carrier violates a law, no matter whether it is a municipal law, a common-law principle, or a statutory law, then no question shall be raised as to the contributory negligence of the employee, no matter how gross his negligence may have been, even though it is shown to the court and jury that his negligence was the proximate cause of the injury? Yet you could not prove it under this proposed provision.

If the chairman will permit, I would submit to the lawyers of the committee the proposition that there can be no

actionable negligence of a carrier that is not a violation of law. How can any case be presented in which the grossest negligence could be pleaded or even set up as a matter to determine the measure of damages, and how can there be any reduction of the damages because of contributory negligence where there is no actionable case of negligence that is not a violation of law? In other words, we are using language here which will confuse, which will lead and invite litigation, when a plain, simple declaration of what is the purposes of the committee can be made in such a way as to avoid any misunderstanding.

As to the other clause:

"All questions of fact relating to negligence shall be for the jury to determine."

I desire to be perfectly frank. I think it ought to go out. Why? Because it does not change the law as it exists to-day, in my judgment, and if it did attempt to change the law it would be clearly unconstitutional. In other words, the seventh amendment protects without any exception whatever, all trials at common law under Federal jurisdiction, as established in England and in this country at the date of the adoption of that amendment.

It was the prerogative of the court at the date of the adoption of that amendment to charge the jury as to questions of law after considering the facts bearing upon those questions. It was the province of the court to determine whether a case should be withdrawn from the jury by reason of the fact that the plaintiff had not in his evidence brought himself within the terms of the law. It was the province of the court, and it is and must be to-day, to set aside a verdict for want of sufficient evidence. Any one of those prerogatives or others that could be mentioned which a provision of the statute of Congress attempted to take from the presiding judge of a Federal court trying a common law case would be in violation of the seventh amendment. The seventh amendment has not added to or taken from the pre-

rogatives of a judge presiding over a court of law a single power that existed at the date of its adoption. It simply preserved the status quo as it then existed, and the authorities on that are perfectly clear.

THE CHAIRMAN. Where did the custom come from which is common in our country in the Federal courts of the judge hearing all the evidence of the plaintiff and then stating that as a matter of law the evidence showed contributory negligence, and thereupon peremptorily to find for the defendant?

MR. FAULKNER. Under the principle of law that when the facts are undisputed, the court may apply the principle of law applicable to that given state of facts; and if those undisputed facts show that the party has been guilty of contributory negligence, the law declared he should not recover, the court, under these circumstances, has the right to take the case from the jury. In some courts, instead of doing that the defendant demurs to the evidence, which brings the facts in the record, and the demurrer asserts that admitting the facts to be true, it does not present a case under the law. If the court sustains the position of the defendant it directs a verdict for the defendant.

SENATOR BORAH. As I understand, when the facts are all in and there is no dispute upon the facts the court holds it is a question of law and not of fact.

MR. FAULKNER. It is purely a question of law.

SENATOR BORAH. That is the way they come at that.

MR. FAULKNER: Yes, sir.

The question as to the power of Congress to interfere with the seventh amendment is very interestingly discussed by Judge Story in the case of Parsons v. Bedford [Breedlove & Robeson] (3 Pet., 433 [7 L.Ed. 732]), and there is a very learned, lucid, and elaborate discussion of this whole question in Capital Traction Company v. Hoff [Hof] (174

U.S. 518[1]) [19 S.Ct. 580, 43 L.Ed. 873].

Judge Sprague, in the circuit court of the United States, in the case of United States against 1,363 Bags of Merchandise [D.C., Fed.Cas.No. 15,964] (2 Sprague, 85 and 88), says:

"The Constitution secures a trial by jury without defining what the trial is. We are left to common law to learn what it is that is secured. Now, the trial by jury was, when the Constitution was adopted—and for generations before that time had been, here and in England—the trial of an issue of fact by twelve men, under the direction and superintendence of the court, and this direction and superintendence was an essential part of the trial."

This decision simply announces the doctrine that I have stated to the committee.

You will find that Mr. Justice Moody, in the case of Howard v. The Illinois Central [207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297], just decided, holds that the provision in the old act, which is similar to this, did not in his judgment affect the law one way or the other. Mr. Justice White virtually takes the same view of it in the majority opinion, and I do not myself believe that it does affect the powers of a court as they exist at common law; and if not, if it has no effect, why put it in? Why leave it a subject for discussion or litigation?

SENATOR BORAH. Senator, there is one phase of the practice in the Federal courts kindred to the one suggested by the chairman. I do not say this in criticism of the Federal courts, or that they all indulge in it. But there are Federal courts which, when the evidence upon both sides is all in, when there is a disputed question, have the practice of charging the jury as to the opinion of the court as to what the evidence is.

MR. FAULKNER. That is true. I realize that is a fact, and I do not see how you are going to avoid it, because the rule of the common law permitted it and the Supreme Court has not criticised it, although it has been brought before it two or three times. It must result from its powers under the seventh amendment. The remedy is, however, that a judge who goes too far is subject to review by the higher court.

It may be proper here to insert a table which will lighten somewhat the labor of the committee in looking over this matter. I desire to put in the record a list of the States that have adopted the prin-* * *.

THORNBERRY, Circuit Judge, with whom GOLDBERG, Circuit Judge, joins (concurring specially):

Having participated in the decision of *Planters* and written an opinion for the Court in Helene Curtis [Industries, Inc.] v. Pruitt, 5th Cir. 1967, 385 F.2d 841, which also involved sufficiency of the evidence, I think it appropriate for me to enter a separate opinion expressing my views. As for Part I of the majority opinion, I agree that federal rather than state law controls. As for the question of whether the standard for sufficiency of evidence in FELA cases is applicable to non-FELA cases, I am not altogether persuaded by Part II of the majority opinion. While the railroad defendant in an action under the FELA is held to a higher standard of care than the defendant in a conventional diversity personal injury action, thus making a directed verdict against the injured plaintiff more unlikely in FELA cases, I am not convinced that a different test for sufficiency follows from this difference in the controlling substantive law. Largely for reasons given by Judge Tuttle in *Planters* and by Judge Rives in his dissent in this case, I adhere to my concurrence in that part of *Planters* which holds that the federal test for sufficiency should be the same in all federal cases. On the other hand, I believe that in the way they characterize the FELA standard *Planters* and *Helene Curtis* may place undue emphasis on Wilkerson v. McCarthy, thereby implying a more restricted role for the judiciary than is truly required by Supreme Court deci-

405

sions in FELA cases. I concur in the overruling of *Planters* to the extent that we there held that on motions for directed verdict and judgment notwithstanding the verdict the court should consider *only* the evidence and inferences which support the non-mover's case.

I concur in Part III of the majority opinion. I read the standard that has been formulated to mean that in ruling on motions for directed verdict and judgment nov the court should consider *all* the evidence, but in the light and with all reasonable inferences most favorable to the opposing party. I interpret this to mean that the court should consider the evidence and inferences most favorable to the opposing party and the uncontradicted evidence put on by the movant. *See* Starling v. Gulf Life Insurance Co., 5th Cir. 1967, 382 F.2d 701, 706; Dehydrating Process Co. v. A. O. Smith Corp., 1st Cir. 1961, 292 F.2d 653, 656 fn. 6. Having done this, the court should grant the motion only if reasonable, fair-minded men could reach no conclusion other than the one urged by the movant.